776 F.2d 1441
 Daniel EASTON, Karl Easton and Jacqualine Easton,
Plaintiffs/Appellants,
v.
The CITY OF BOULDER, COLORADO, David Allen, individually and
as police officer, Boulder, Colorado, Ken
Sundberg, individually and as police
officer, Boulder, Colorado,
Defendants/Appellees.
 No. 83-1970.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 28, 1985.
 
 1
 David S. Williamson of Newport, R.I. (Bruce P. Shaffer, Boulder, Colo., with him on the brief), for plaintiffs/appellants.
 
 
 2
 Thomas L. Kanan (Theodore S. Halaby and Leslie L. Schluter with him on the brief) of Halaby & McCrea, Denver, Colo., for defendants/appellees.
 
 
 3
 Before LOGAN and McWILLIAMS, Circuit Judges, and BOHANON, Senior District Judge.*
 
 
 4
 BOHANON, Senior District Judge.
 
 
 5
 This appeal is taken by Karl Easton and Jacqualine Easton from the trial court's dismissal before trial of their claims of negligent and intentional infliction of emotional distress. Daniel Easton also appeals the Directed Verdict granted against him by the trial court at the conclusion of the plaintiffs' presentation of evidence at trial. All of appellants' claims stem from the alleged wrongful arrest of Daniel Easton by the individual appellant police officers in 1981. We find that the rationale given by the district court for its decision to direct the verdict against Daniel Easton was suspect, given the current state of the law, but we must on the record before us affirm the result reached. We also affirm the trial court's dismissal of the claims of Karl and Jacqualine Easton.
 
 Facts
 
 6
 On October 19, 1981, the parents of a Boulder, Colorado, boy contacted the Boulder Police Department to report that their son Michael had been sexually molested on the previous day. Police Officer Robert Wands responded to the complaint and interviewed Michael's step-father, Michael (also known as "Mikey"), a five year old playmate of Michael named Damian who had witnessed one of two sexual assaults described by Michael, and Damian's mother. Officer Wands' report states that Michael was four years old; however, it also gives Michael's birthday, December 10, 1977, revealing that Michael actually lacked some two months being four.
 
 
 7
 Officer Wands' report indicates that Michael's step-father became aware of the incidents in question while preparing Michael for bed on October 18, 1981. Michael was talking about events of the day and related to his father that he had met a man in the apartment complex where he and his parents resided and had gone to the man's apartment where a non-violent sexual assault occurred. Later that afternoon the same man approached Michael and Damian as they were playing on the west side of the apartment complex. At his suggestion the boys followed the man to a laundry room in a nearby apartment complex where the man made a tent out of an old blanket. The man crawled under the tent and had the boys join him, then sexually assaulted Michael again. When Michael's father asked Michael to show him the apartment where the man took Michael, he pointed to apartment No. 218.
 
 
 8
 When interviewed personally by Officer Wands, Michael's own statements confirmed, with added detail, all the facts related by his father. Wands' separate interview of Damian also corroborated all the facts given by Michael and by his father with respect to the assault Damian witnessed. When asked by Officer Wands to accompany him and show him the man's apartment, Michael again pointed to No. 218. Damian also indicated that apartment No. 218 was the man's residence. Damian and Michael together led Wands to the laundry room where the second assault took place. There Wands found a blanket, which both boys identified as the one the man had used to make a tent, and a black vinyl chair. Upon checking the manager's records on apartment No. 218, Wands found it to be inhabited by Daniel Easton, one of the plaintiffs in the instant action. Wands questioned the apartment manager, obtained a physical description of Easton, and learned that Easton had lived at the complex for four years and was quiet and a loner with few if any friends visiting him at the apartment complex. Wands' report also noted that Easton had "been observed in the past staring at the children playing in the common area of the apartment complex."
 
 
 9
 After Officer Wands concluded his investigation, there was no further police action in the case until October 26, 1981, when the case was assigned to the defendant appellee Detective David Allen of the Crimes Against Persons Bureau. Detective Allen had had little experience with juveniles and after reviewing Wands' report he decided to wait until the following day, when the defendant appellee Detective Kenneth Sundberg, a juvenile detective, was available to assist in interviewing the children.
 
 
 10
 Michael was interviewed, in the presence of his stepfather, in their apartment on the morning of October 27. Most of the interview was recorded, and subsequently transcribed. The questions were asked by Detective Sundberg. Michael's responses to Detective Sundberg's questions were somewhat confused and differed in some particulars from the account reported earlier by Officer Wands. The transcript appears to indicate that by the time of the later interview Michael recalled only one encounter with the man, that being the occurrence involving the blanket tent in the laundry room when Michael and the man were accompanied by Damian. This time Michael denied that he had been in the man's "house" (apartment) and also denied that he had previously said he had been in the "house." He did, however, again indicate by pointing that apartment No. 218 was the man's residence. His description of the events in the laundry room was still consistent with the account reported by Wands. Michael described the man as having brown collar length hair, which was consistent with the description of Easton given to Wands by the apartment manager.
 
 
 11
 At the end of the interview, after the tape recorder was turned off, Michael was sitting on his stepfather's lap when the stepfather noticed a man coming out of his apartment across the complex and asked Michael "Is that the man?" According to Detective Sundberg's testimony at trial "[a]t that point, his son slunk down into his chest and said an audible 'Yes,' and then tucked his head into his father's chest." Detective Sundberg indicated that the way Michael shyed away from Easton when making the identification convinced Sundberg that Michael was not at all confused and that a positive identification had been made.
 
 
 12
 Subsequently, the detectives approached the man identified by Michael and, without advising him of the nature of their investigation or placing him under arrest, obtained identification establishing that he was Daniel Easton. The detectives then visited the managing office of the apartment complex and obtained a copy of the rental agreement for apartment 218 which corroborated Officer Wands' earlier report that Daniel Easton was the only resident.
 
 
 13
 Later that same day, Detective Sundberg returned to the apartment complex to interview Damian. The five year old's description of the sexual assault in the laundry room was consistent with all previous accounts. In this interview, however, Damian related that after the laundry room incident the man took the boys to his apartment and showed them around. Damian denied that there was any sexual assault at that time. He confirmed that the apartment he had previously shown Officer Wands was the one where the man who assaulted Michael lived. Damian's physical description of the man was at variance with Michael's in that he said the man's hair color matched his own, which is light brown to blond, and was not like the dark brown hair of another individual who was present at the time of Damian's interview.[1] Daniel Easton has dark brown hair.
 
 
 14
 In the late afternoon of the day when Michael and Damian were interviewed, Detective Allen, with Detective Sundberg's assistance, drafted an affidavit for a warrant to arrest Daniel Easton for commission of the crime of sexual assault on a child. Because of this document's importance to our discussion in this case, the affidavit's statement of facts establishing grounds for issuance of an arrest warrant are quoted at length in the margin.[2]
 
 
 15
 It should be noted that the affidavit does not give all the information known to the police at the time it was prepared. Among other items not mentioned were Michael's initial account of a sexual assault in the man's apartment, Michael's repeated identification of apartment No. 218 as belonging to the man and the fact that the apartment manager's records showed Easton rented that apartment. The affidavit also makes no reference to Damian's account of the events in question.
 
 
 16
 When the affidavit was completed, it was reviewed by Detective Allen's supervisor, Sargeant Hendry, and then by attorney Robert Keatley, the police legal advisor. By then it was after 5:00 p.m. on a Friday evening and the detectives had to take the affidavit to the home of Boulder County Court Judge David Torke to get the warrant issued. Judge Torke took Detective Allen's oath on the affidavit and then, based solely on the facts stated therein, signed the warrant for David Easton's arrest. Detectives Allen and Sundberg arrested Easton at approximately 7:00 p.m. at the Colorado University School of Music, where he was a student. Easton spent the night in the Boulder County jail before being released on bail the following afternoon at his first court appearance. Easton's parents, Karl and Jacqualine Easton, the other two plaintiff/appellants in this matter, attended this court appearance and Daniel lived with them in New York City, subject to bond restrictions, for the following five weeks. At the end of that period, the Boulder District Attorney's Office decided not to file formal charges, and Easton was discharged from his bond obligations.
 
 
 17
 Thereafter, on May 5, 1982, appellants brought this suit against the City of Boulder, Colorado, and Officers Allen, Sundberg and Wands, both individually and in their capacities as police officers. Appellants claimed the actions of the police officers and the failure of the City to train officers properly resulted in a denial of Daniel Easton's civil rights granted under the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution. The complaint purported to state claims for relief under 42 U.S.C. Secs. 1981, 1983 and 1988. The Eastons also attempted to assert several tort claims under state law, including claims by Karl and Jacqualine Easton for intentional infliction of emotional distress, outrageous conduct, and negligent infliction of emotional distress.
 
 
 18
 Prior to trial, the parties stipulated to the dismissal of Officer Wands from the suit, and the trial court, on defendants' motion, dismissed Karl and Jacqualine Easton as plaintiffs, finding their allegations to be insufficient as a matter of law to state a claim for relief. Also before trial, the judge ordered that the trial be bifurcated as to issues of liability and of damages. Trial to a jury commenced on June 27, 1984.
 
 
 19
 After the presentation of Daniel Easton's case, the trial judge granted defendants' motion for a directed verdict. In making his oral ruling on this motion, the trial judge had the following comments on the basis for his decision regarding the validity of the warrant for Easton's arrest:
 
 
 20
 My view of the law is that a warrant can be challenged and set aside in a civil action such as this upon a showing that the police officer obtaining the warrant obtained it through intentional misrepresentation; that is to say, knowing that the affidavit was false.... Or it can be set aside upon a showing that the police officer making the affidavit did so with a reckless disregard for the truth ...
 
 
 21
 * * *
 
 
 22
 ... it is my position on the law that a negligent misrepresentation does not void a warrant.
 
 
 23
 The court found that, viewing the evidence and the inferences therefrom most favorably to the plaintiff Easton, no jury could reasonably find intentional misrepresentation or reckless disregard for the truth in the obtaining of the subject warrant based on the evidence presented in plaintiff's case. He further concluded that if Easton was arrested on a valid warrant there could have been no violation of Easton's constitutional rights giving rise to a cause of action under 42 U.S.C. Sec. 1983. The judge also found the defendants to be protected by the warrant from Easton's state law tort claims and, further, that the defendant officers' affirmative defenses of qualified immunity were established.
 
 
 24
 On appeal, the Eastons raised the following contentions: 1) it was error for the trial court to bifurcate the trial as to the issues of liability and damages; 2) the existence of a valid arrest warrant does not, in and of itself, constitute a complete defense to a 42 U.S.C. Sec. 1983 claim for unlawful arrest; 3) negligent misrepresentation by police officers in obtaining an arrest warrant is sufficient to invalidate the warrant; 4) the evidence at trial was, in any event, sufficient to allow a jury to conclude that the defendant officers made intentional misrepresentations or acted with a reckless disregard for the truth in obtaining the arrest warrant; 5) Colorado law recognizes a cause of action against police officers who negligently conduct criminal investigations; 6) Colorado law also recognizes a cause of action against police officers who negligently misrepresent facts in obtaining an arrest warrant; 7) the City of Boulder is liable for negligently training or supervising the defendant officers in the areas of arrest warrant procedures and investigation of crimes involving small children; 8) the trial court erred in dismissing the claims of Karl and Jacqualine Easton for intentional or negligent infliction of emotional distress.
 
 The Trial Court's Decision to Bifurcate
 
 25
 Easton first asserts that he was prejudiced by the trial court's decision to bifurcate the trial as to liability and damages because damages are an essential element of the torts of negligence and culpable recklessness (gross negligence) and must be considered in determining whether a particular risk was unreasonable. United States v. Carroll Towing Company, 159 F.2d 169, 173 (2nd Cir.1947); Sagar v. City of Woodland Park, 543 F.Supp. 282 (D.C.Colo.1982). The Federal Rules of Civil Procedure give district courts broad discretion in deciding whether to sever issues for trial and the exercise of that discretion will be set aside only if clearly abused. F.R.CIV.P. 42(b); Parmer v. National Cash Register Company, 503 F.2d 275, 277 (6th Cir.1974); Idzojtic v. Pennsylvania Railroad Company, 456 F.2d 1228, 1230 (3rd Cir.1972); 9 Wright & Miller, Federal Practice and Procedure Sec. 2392 (1971). The theory advanced by Easton, if accepted, would have the result of forbidding bifurcation whenever the plaintiff's claim is based on negligence--a consequence certainly at odds with common practice. See, e.g. Idzojtic, 456 F.2d at 1230. We need not decide this issue today, however, since we determine infra that the question of whether there was probable cause for the issuance of the warrant to arrest Michael Easton is dispositive of the appellants' claims. Because any evidence of Easton's damages is irrelevant to the determination of probable cause, he has suffered no prejudice, and any error by the trial court in this regard is harmless.
 
 The Directed Verdict
 
 26
 Section 1983[3] does not by itself impose any state of mind requirement on those to be held liable under its provisions. Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); Hewitt v. City of Truth or Consequences, 758 F.2d 1375, 1378 (10th Cir.1985) ("negligent conduct may under appropriate circumstances give rise to a constitutional deprivation remediable under section 1983"); McKay v. Hammock, 730 F.2d 1367 (10th Cir.1984) (en banc). For any such requirement to be applicable in a particular case, it must be necessitated by the character of the alleged violation of the Constitution or laws of the United States upon which Sec. 1983 liability is to be predicated.
 
 
 27
 In this case on appeal Daniel Easton does not seriously argue that any of his constitutional rights are in issue, other than those granted by the Fourth Amendment and made applicable to the states by the Fourteenth. The relevant portions of the Fourth Amendment provide that:The right of the people to be secure in their persons ... against unreasonable ... seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the ... persons ... to be seized.
 
 
 28
 Easton was arrested upon a warrant and does not before us challenge the facial validity of that warrant. The extent to which, and under what circumstances, the facial validity of the warrant can be penetrated and the warrant set aside on the basis of the conduct of police officers before the magistrate issued the warrant, is the key issue of law in determining whether Easton has suffered a deprivation of his rights actionable under Sec. 1983 and the Constitution.
 
 
 29
 The circuit courts that have considered the question of whether a Sec. 1983 suit based upon a claim of unlawful arrest can be sustained where the arrest was pursuant to a warrant, are not in agreement, and at times even different panels within the same circuit appear to have been in unknowing conflict on the issue. The Fifth Circuit in 1982 held, in a Sec. 1983 suit alleging malice on the part of an arresting officer, that "where an arrest is made under authority of a properly issued warrant, the arrest is simply not a false arrest.... Such an arrest is not unconstitutional, and a complaint based on such arrest is subject to dismissal for failure to state a claim." Smith v. Gonzales, 670 F.2d 522, 526 cert. denied 459 U.S. 1005, 103 S.Ct. 361, 74 L.Ed.2d 397 (1982) (citations omitted). This holding has never been overruled and was followed by the same court as recently as 1984. Wheeler v. Cosden Oil and Chemical Co., 744 F.2d 1131 (1984). Nonetheless, in an opinion filed less than a month after Wheeler, the same circuit ruled that in a Sec. 1983 suit for unlawful arrest, evidence of intentional or reckless misrepresentations made by police officer defendants in obtaining a warrant, if believed by the jury, would invalidate the warrant and expose the officers to liability. Hindman v. City of Paris, Texas, 746 F.2d 1063 (1984). This latter position is more in line with that of several other circuits. Smiddy v. Varney, 665 F.2d 261 (9th Cir.1981) cert. denied, 459 U.S. 829, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982); Ames v. United States, 600 F.2d 183 (8th Cir.1979); Dellums v. Powell, 184 U.S.App.D.C. 275, 566 F.2d 167 (1977) cert. denied 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); see Gonzales, 459 U.S. at 1006, 103 S.Ct. at 362 (White J. dissenting from denial of certiorari). The First Circuit has gone even further, holding that "where an officer is 'constitutionally negligent,' that is, where the officer should have known that the facts recited in the affidavit did not constitute probable cause," Sec. 1983 liability will attach. Briggs v. Malley, 748 F.2d 715, 721 (1984) cert. granted --- U.S. ----, 105 S.Ct. 2654, 86 L.Ed.2d 271 (1985).[4]
 
 
 30
 Since the Supreme Court has granted certiorari in Briggs, a definitive resolution of the matter is likely to be forthcoming. Without expressing an opinion on the disputed question ourselves, at this time, we note only that even giving Easton the benefit of the most lenient position reasonably possible, the Constitution requires no more of officers seeking a warrant (or for that matter, making a warrantless arrest) than probable cause. Having examined the record of the evidence presented in the trial of this case in great detail, we can find no basis upon which a jury could have reasonably concluded that Detectives Allen and Sundberg did not have probable cause when they prepared the affidavit and obtained the warrant from Magistrate Torke and when they arrested Easton.
 
 
 31
 On appeal, Easton's challenge to the validity of the warrant is primarily directed toward challenging the reliability of the child testimony used by the police. Easton seems to suggest that because Damian was only 5 years and 9 months old and Michael only 3 years and 10 months old, their testimony was somehow suspect to begin with. This is an entirely unacceptable point of view. In a great many child molestation cases, the only available evidence that a crime has been committed is the testimony of children. To discount such testimony from the outset would only serve to discourage children and parents from reporting molestation incidents and to unjustly insulate the perpetrator of such crimes from prosecution.
 
 
 32
 Easton also charges that "[t]he children were not interviewed by anyone with expertise in obtaining information from children." (App. brief at 27) To the contrary, Officer Sundberg at trial testified that he had interviewed 50 to 60 children over the past 3 1/2 years as a juvenile detective and had attended an institute in Minnesota on juvenile police work which included a segment on the investigation of child abuse. Furthermore, it would, as the trial court noted, place an intolerable burden on many smaller communities and law enforcement agencies to require police to use only juvenile experts to interview children in connection with child abuse cases.
 
 
 33
 Again, Easton claims that "[t]he individual Defendants made absolutely no attempts to corroborate independently the statements of these children. The Defendants took no steps whatsoever to determine the reliability of the children with respect to the identification." id. We find it extremely difficult to imagine even that these charges are presented to us in good faith. The record plainly shows that Detectives Allen and Sundberg corroborated the children's statements about where the suspect lived and Michael's visual identification in two ways; 1) by checking the apartment complex records which established that Easton was the only resident of apartment 218, and 2) by contacting Easton directly based on Michael's identification and obtaining identification which showed his name and address. The officers also had Officer Wands' report which corroborated the children's interview statements to the detectives about the laundry room incident and described Wands' own corroboration of the children's story by having them lead him to the laundry room where he found the blanket and chair they had mentioned.
 
 
 34
 Easton's appellate brief contains other statements which similarly are either poorly supported by the record or flatly contradicted by it, but we do not find it necessary or desirable to comment on each one. We turn instead to the one point which does lend some merit to the appellants' case, if not conclusively so, that being the existence of apparent inconsistencies in the children's statements.
 
 
 35
 It is a fact that Michael's statements concerning the occurrence of a sexual assault in Easton's apartment before the laundry room incident are self-contradictory. It is also true that Michael's later statement that he had never been in Easton's apartment was contradicted by Damian's description of the visit there after the laundry room assault. Damian's comments about the man's hair color are inconsistent with Michael's. There are other minor discrepancies, but these are the only ones we find significant upon the record.
 
 
 36
 We begin by noting that when examining informant evidence used to support a claim of probable cause for a warrant, or a warrantless arrest, the skepticism and careful scrutiny usually found in cases involving informants, sometimes anonymous, from the criminal milieu, is appropriately relaxed if the informant is an identified victim or ordinary citizen witness.
 
 
 37
 Courts are much more concerned with veracity when the source of the information is an informant from the criminal milieu rather than an average citizen who has found himself in the position of a crime victim or witness. As noted by Justice Harlan in United States v. Harris [403 U.S. 573, 579, 91 S.Ct. 2075, 2079, 29 L.Ed.2d 723 (1971) (dissenting opinion) ], "the ordinary citizen who has never before reported a crime to the police may, in fact, be more reliable than one who supplies information on a regular basis." Basis of knowledge is likewise less of a problem in the victim-witness cases, for by definition the victim or witness is reporting first-hand knowledge.
 
 
 38
 1 W.R. LaFave, Search and Seizure, 586-587 (1978); cf. Jaben v. United States, 381 U.S. 214, 224, 85 S.Ct. 1365, 1370, 14 L.Ed.2d 345 (1965). This relaxed standard is consistent with the common sense approach taken by the Supreme Court in defining probable cause. "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of every day life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949) quoted in Illinois v. Gates, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983).
 
 
 39
 The standard of probable cause does not require indubitable or necessarily convincing evidence, but only so much "reasonably trustworthy information" as "to warrant a prudent man in believing that the [arrestee has] committed or [is] committing an offense." Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964).
 
 
 40
 While a warrant may issue only upon a finding of "probable cause," this Court has long held that "the term 'probable cause' ... means less than evidence which would justify condemnation." Locke v. United States, 7 Cranch 339, 348 [3 L.Ed. 364], and that a finding of "probable cause" may rest upon evidence which is not legally competent in a criminal trial. Draper v. United States, 358 U.S. 307, 311 [79 S.Ct. 329, 332, 3 L.Ed.2d 327].
 
 
 41
 United States v. Ventresca, 380 U.S. 102, 107, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965).
 
 
 42
 Thus even if the testimony of Michael and Damian was inadmissible in court, perhaps because of an inability to understand the oath, or for whatever reason, their statements could nonetheless be used as a basis for a probable cause determination to support the issuance of a warrant. The existence of inconsistencies in their statements does not change this principle of law in the least. Even with respect to evidence admitted during a trial, we have noted that "[e]vidence is not necessarily insufficient merely because the witness' testimony has been contradictory and the explanations therefor difficult of belief." United States v. Jackson, 579 F.2d 553, 558 (10th Cir.) cert. denied sub nom Allen v. United States, 439 U.S. 981, 99 S.Ct. 569, 58 L.Ed.2d 652 (1978). See also United States v. Tropiano, 418 F.2d 1069, 1074 (2nd Cir.1969) ("A witness may be inaccurate, contradictory and even untruthful in some respects and yet be entirely credible in the essentials of his testimony.") cert. denied 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970); In Re A.H.B., 491 A.2d 490, 495 (D.C.App.1985) ("A certain amount of inconsistency in the evidence is almost inevitable in any trial, but it rarely justifies reversal.") We would indeed be amiss if we were to hold police officers and magistrates to a stricter standard when evaluating evidence for a probable cause determination.
 
 
 43
 Here the inconsistencies pressed by Easton do nothing to undermine the solid core of the children's statements regarding the laundry room assault and the location of the perpetrator's apartment. Nor do they detract from the detectives' impression, based on personal observation of Michael's demeanor and behavior, that his statements were spontaneous and revealed knowledge of things that a child his age could not possibly possess had an event of the kind described not occurred. The children's descriptions of the laundry room assault and Michael's visual identification of Easton were further corroborated by the investigations of Officer Wands and the detectives. The detectives did not need Michael's statement about a further assault in the man's apartment to establish probable cause and did not rely on it in the affidavit they submitted to Judge Torke. It is true that the detectives acted with haste to arrest Easton once they had completed their interviews with the children, but they had probable cause at that time and also had a legitimate concern for the welfare of other children in the apartment complex. They also were concerned, as Detective Sundberg testified at trial, that the people in the apartment complex might find out who Easton was and take retaliatory action against him.
 
 
 44
 Easton also argues that because the affidavit submitted to Judge Torke by Allen and Sundberg makes no reference to the inconsistencies, and otherwise rephrases some of the children's statements, the detectives are guilty of intentionally misleading the judge. However, because the evidence excluded in no way alters the fact that the evidence included states probable cause, the warrant was valid, whatever the intent of the officers, and Easton suffered no harm. This is not to imply that we find any evidence whatsoever to refute the trial court's finding that there was no intentional misrepresentation or reckless disregard for the truth on the part of Detectives Allen and Sundberg.[5]
 
 
 45
 We have considered the remainder of appellants' arguments with regard to the arrest of Easton and find them to be without merit. Upon this record the arrest was clearly lawful. This being decided, the remainder of Daniel Easton's arguments and the arguments of his parents Karl and Jacqualine Easton are mooted.[6] In conformity with the preceding considerations, the decision or the trial court is affirmed.
 
 
 
 *
 Honorable Luther Bohanon, Northern, Eastern and Western Districts of Oklahoma, sitting by designation
 
 
 [1]
 The transcript of the portion of the interview relating to the suspect's hair color can be read to indicate that Damian was somewhat confused on this matter:
 Sundberg: Do you know what he looks like? Can you tell me what he looks like? Why don't you?
 Damian: He was kind of hair, he has the color of my hair and he's like a Bruce ...
 Sundberg: What's color is his hair?
 Damian: What?
 [Damian's mother]: Dark like Bruce's?
 Damian: No, like mine.
 [Damian's mother]: Are you sure?
 Damian: White.
 At trial Detective Sundberg stated that he did not find Damian's statements to be a discrepancy because subsequent investigations revealed that Easton had worn a white wig on some occasions when presenting puppet shows to children in the apartment complex. However, this last information does not appear to have been known by the police prior to Easton's arrest and so will not be considered by us in relation to the matter of probable cause discussed infra.
 
 
 [2]
 The Affiant, Detective Dave Allen, is a duly commissioned member of the Boulder Police Department in the City of Boulder, County of Boulder, State of Colorado
 On October 19, 1981, Officer Bob Wands of the Boulder Police Department responded to the address of 1024 Adams Circle, # 216, Boulder, Colorado, reference to a complaint on a sexual assault on a child. A police report was taken, CR# 81-11313. The details surrounding the sexual assault were recorded in the police report. Affiant personally read this report.
 The report stated that Officer Wands met with the Complainant, [name deleted], (date of birth 3/25/55) who stated he is the stepfather to the victim, Michael [name deleted], age 4. [The stepfather] stated that as he was preparing Michael for bed on the night of October 18, 1981, his son began talking of an incident that took place during the day. The contents of that conversation were told to Officer Wands by the Complainant.
 The Affiant and Detective Ken Sundberg of the Boulder Police Department, personally talked with the Complainant and the Victim on the date of October 27, 1981.
 The Victim, Michael [name deleted], stated personally to the Affiant that he and a friend, Damian (who was identified by Officer as Damian [name deleted], age 5, address of 1024 Adams Circle, # 126, Boulder, Colorado) were playing together on October 18, 1981, at approximately 1100 hours.
 The Victim stated to the Affiant that he and Damian were invited by a "man" to come into the laundry room, which is located at the same apartment building, 1024 Adams Circle. Once the boys had entered the laundry room, the "man" who had draped a blanket over some chairs, forming a tent, crawled under the blanket. The "man" once under the blanket took his own outer pants off, exposing his genitals and had the two victims crawl under the blanket with him. The Victim stated to Affiant that once under the blanket, the "man" pulled Michael's pants down and touched the boy's genitals.
 During the interview by the Affiant and Detective Sundberg, it was learned that the Victim, Michael, referred to his penis as "pee wee". The Victim referred to "pee wee" several times during the interview. Detective Sundberg asked the Victim to point on his own body where his pee wee was and Michael pointed to the area just below the waist between his legs.
 During a portion of the interview, the Victim was sitting on his father's lap looking towards the picture window in the living room, when a male subject walked out of a neighboring apartment. The Victim, Michael, stated that the subject was the same "man" who had touched him on the day in question.
 The Affiant and Detective Sundberg, upon hearing this identification, left the victim's apartment and contacted the subject.
 The "man" identified himself to the Affiant as Daniel Easton, date of birth 10/13/57, address of 1024 Adams Circle, # 218, Boulder, Colorado. The Affiant observed that the subject was a white male, height 5'5", 115#, brown hair and brown eyes.
 Based on the details of the incident, and the identification by Victim, Michael [name deleted], the Affiant hereby requests an Arrest Warrant be issued for subject, Daniel Easton, date of birth 10/13/57, charging him with Sexual Assault on a Child, 18-3-405, 1973, C.R.S. as amended.
 
 
 [3]
 42 U.S.C. Sec. 1983 (1982) provides, in pertinent part, that:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....
 
 
 [4]
 The Fifth Circuit opinion in Hindman also noted that an officer's subjective good faith has been irrelevant since the Supreme Court's decision in Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Hindman court did not, however, comment on the apparent inconsistency, under traditional tort concepts, in permitting warrants to be invalidated for intentional or reckless misrepresentations but not for negligence when subjective good faith is not a permissible consideration
 
 
 [5]
 It should be noted that no substantial falsehoods were included in the affidavit. Paraphrasing of informant statements or non-verbal responses to questions is perfectly acceptable on such affidavits and, although appellants find mischief in the fact that the affidavit states Michael's age to be 4 when he was in fact only 3 years and 10 months old, we find it more plausible that Detective Allen was merely relying on Officer Wands' report which also stated the age to be 4 although it also accurately gave Michael's date of birth
 
 
 [6]
 Probable cause has always been a good defense to a charge of malicious prosecution, Keeton and Prosser, Law of Torts, 876 (5th ed. 1984), and has also been recognized by Colorado as a complete bar to a claim for relief based on a theory of false arrest. Enright v. Groves, 39 Colo.App. 39, 560 P.2d 851 (1977); White v. Pierson, 533 P.2d 514 (Colo.App.1974). Negligence is similarly not actionable given our finding in these circumstances