James BRUNING, Plaintiff–Appellee,

v.

Reid C. PIXLER, Individually and in His Official Capacity as District Attorney for the Seventh Judicial District; Joseph S. Pacyga, Individually and in His Official Capacity as Deputy District Attorney for the Seventh Judicial District; District Attorney's Office for the State of Colorado's Seventh Judicial District, Floyd Johnson, Individually and in His Official Capacity as Chief of the Gunnison Police Department, City of Gunnison Police Department, James Robert Keehne, Russell Locke, Robert G. Ryan, Defendants,

and

Keith Robinson, J. Stewart Ferguson, Defendants–Appellants.

No. 90–1296.

United States Court of Appeals, Tenth Circuit.

Nov. 15, 1991.

Daniel M. Reilly and Larry Pozner, Denver, Colo., for plaintiff-appellee.

Don D. Jacobson, Lohf, Shaiman & Ross, P.C., Denver, Colo., for defendants-appellants.

Before McKAY, Chief Judge, EBEL, Circuit Judge, and SAFFELS,* District Judge.

EBEL, Circuit Judge.

■ Defendants Keith Robinson and J. Stewart Ferguson appeal the district court's order denying their Motion for Summary Judgment based on qualified immunity.[1] Both Defendants are members of the Gunnison, Colorado Police Department (GPD), who contend that they are immune from liability for their alleged wrongful acts in obtaining an order for nontestimonial identification and an arrest warrant for Plaintiff. "We review the denial of immunity *de novo* as a final decision under 28 U.S.C. § 1291." *Snell v. Tunnell*, 920 F.2d 673, 675 (10th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991). Upon review, we conclude the district court properly denied Defendants' Motion for Summary Judgment.

## I.

In the early hours of June 17, 1986, "Victim # 1," who had just finished work at a grocery store in Gunnison, was sexually assaulted by a man who had hidden himself in the back of her car. Victim # 1 reported the assault to Officer Keehne of the GPD, who failed to make any written or oral record of his conversation with Victim # 1.

On June 25, 1986, Victim # 1 saw Plaintiff, with whom she was acquainted, in the grocery store and was struck by his resemblance to her assailant. Victim # 1 became upset, left work, and went to the GPD. She spoke with Officer Locke and Detective Robinson, but neither officer made any written or oral record of the conversation with Victim # 1.

On September 5, 1986, Victim # 2 was sexually assaulted in her home in Gunnison. She reported the assault to Officer Ryan of the GPD. Victim # 2 was blindfolded throughout the assault and never saw her assailant.

On October 7, 1986, Durango Police Detective O'Connell, who was assisting with the investigation, interviewed Victim # 1. Detective O'Connell tape recorded the interview, and the recording was subsequently transcribed. During this interview Victim # 1 described the assault and what she was able to see of the assailant as follows.

Victim # 1 got into her car, which was parked at the grocery store, and turned on the dome light to get her cigarettes out of her purse. She sensed something in the back of her car and turned to see a man she did not know crouched in the back seat. Because he was able to crouch down so far, Victim # 1 thought the man could not be very big: "Like five eight I think is pushin it." R. Vol. I, Doc. 6, Ex. C at 5. The man had a white handkerchief over his nose and mouth, so Victim # 1 could not see his face below the bridge of his nose. She distinctly remembered that his eyes were icy blue, and described him as having a receding hairline, blondish hair, and a reddish complexion. When she looked at him, the man yelled at her to turn off the light, which she did. Victim # 1 did not have an opportunity to see the man thereafter. He stayed behind her in the car while she drove to a deserted parking lot, at his direction, and while she got out of the car. Victim # 1 was blindfolded during the assault and, at the assailant's direction, kept her head averted while he fled the scene.

During the interview with Detective O'Connell, Victim # 1 said that she had been having nightmares about the assault and in them she knew the assailant. When

---

* Honorable Dale E. Saffels, Senior District Judge, United States District Court for the District of Kansas, sitting by designation.

1. After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R.App.P. 34(a); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument.

asked who the assailant was in her dreams, she replied that it was different people. She also said she dreamed the assailant was her store manager one time, and that he was a customer in the grocery store in another dream, but she knew it was not really either of these people.

Victim # 1 did not identify Plaintiff as the assailant, though in response to Detective O'Connell's statement: "It could well be that you will eventually recognize this guy," following the discussion of Victim # 1's dreams, Victim # 1 said:

> [Victim # 1]: Well there is one person that gave, I've gave the name to the Police and stuff. It just freaked me out one day when he came in cause I know him, his girlfriend is one of the people I told I was working that night, you know, and.
>
> Det. O'Connell: Does he have receding blond hair?
>
> [Victim # 1]: Yep.
>
> Det. O'Connell: And the icy blue eyes?
>
> [Victim # 1]: Yep. And the build. And everything. And.
>
> Det. O'Connell: You could be right.
>
> [Victim # 1]: But it, I mean it bothers me but I can't even talk to this person anymore. You know.
>
> Det. O'Connell: Yeah. Well that's, even if it isn't him I'm sure he's gonna understand. He's too close to . . .
>
> [Victim # 1]: Yeah.
>
> Det. O'Connell: To the real thing, even if it isn't him.

*Id.* at 27. In response to Detective O'Connell's statement near the end of the interview: "You're still don't know who he is." Victim # 1 responded "No." *Id.* at 30.

On October 24, 1986, Detective Robinson and Denver Police Detective Wallis interviewed Victim # 1. They too failed to record the interview in writing or on tape. After the interview, Detective Robinson drafted an affidavit in support of an order for nontestimonial identification from

Plaintiff in connection with the two assaults. Based on the affidavit, the court entered the order, which was carried out on October 27, 1986. Pursuant to the order, Plaintiff was required to give police samples of his fingerprints, blood, hair and saliva, to make a voice recording, and to be photographed.

On October 28, 1986, although all the samples from Plaintiff had not yet been analyzed, Officer Ferguson[2] drafted an affidavit in support of a warrant for Plaintiff's arrest for the two sexual assaults.[3] Plaintiff was arrested that day.

After the preliminary hearing, held on December 11, 1986, and January 22, 1987, the judge dismissed the charges for lack of probable cause. Plaintiff then brought this suit against Defendants and others for violation of his civil rights in connection with his arrest and prosecution.

## II.

Plaintiff admitted that on their faces, Defendants' affidavits established probable cause. He contended, however, that the affidavits contained material false statements or omissions that Defendants made intentionally or with reckless disregard for the truth.

Specifically, Plaintiff alleged that Detective Robinson falsely and recklessly represented in his affidavit that Victim # 1 had (1) positively identified Plaintiff as her assailant; (2) observed Plaintiff some days after the assault wearing grey sweatpants; (3) observed the color of Plaintiff's eyes; and (4) stated that Plaintiff's eyes were the same color as her assailant's. R. Vol. I, Doc. 1 at 3–4.

Plaintiff also alleged that Detective Robinson intentionally and maliciously failed to include in his affidavit the following information: (1) in the brief moment Victim # 1 saw the assailant, he wore a mask over his face; (2) Victim # 1 only saw the assail-

---

2. The record does not reveal Officer Ferguson's role in the investigation of either assault.

3. The only evidence linking the two assaults together appears to be that in each assault the assailant held a knife to the victim's throat, blindfolded the victim, and wore what each victim thought was a nylon windbreaker. Also, the statements each victim reported the assailant made during the assault were similar.

ant's face above the bridge of his nose; (3) Victim # 1 gave an extensive recorded statement to Detective O'Connell on October 7, 1986, for the purposes of identifying the assailant; (4) even though she knew Plaintiff before the assault, Victim # 1 did not identify Plaintiff as her assailant during this interview; (5) in the interview Victim # 1 said she did not know who assaulted her; (6) Victim # 1 told Detective O'Connell that the man who assaulted her was not more than 5' 8"; (7) Plaintiff is 5' 11"; (8) Victim # 1 described her assailant as being of slim to medium build; (9) Plaintiff weighs 190 pounds; (10) Victim # 1 told Detective O'Connell her assailant had icy blue eyes; (11) Plaintiff has hazel eyes; (12) Victim # 1 told Detective O'Connell she thought the man who assaulted her might be a person who worked at the Standard Gas Station in Gunnison; and (13) Victim # 2 was blindfolded throughout her assault and could not identify her assailant. *Id.* at 4–5.

Plaintiff alleged that Officer Ferguson's affidavit contained the same false statements and omissions. Plaintiff claimed that by their misrepresentations, Defendants violated his rights under the Fourth and Fifth Amendments.

Defendants moved for summary judgment claiming qualified immunity under *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The Court held in *Malley* that an officer is immune from liability for his actions in seeking a warrant unless "a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Id.* at 345, 106 S.Ct. at 1098.

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Court adopted an objective standard for qualified immunity. Under the *Harlow* standard, government officials will not be liable for their conduct when performing discretionary functions unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102

S.Ct. at 2738. "Because of the important values protected by qualified immunity, the procedures to be followed when this particular affirmative defense is raised differ from those applicable to most other affirmative defenses." *Powell v. Mikulecky,* 891 F.2d 1454, 1457 (10th Cir.1989).

■ When a government official raises the defense of qualified immunity in a motion for summary judgment, the plaintiff must produce facts "sufficient to show both that the defendant's alleged conduct violated the law and that that law was clearly established when the alleged violation occurred." *Pueblo Neighborhood Health Ctrs. Inc. v. Losavio,* 847 F.2d 642, 646 (10th Cir.1988). Only after the plaintiff has met this burden must the defendant bear the usual summary judgment movant's "burden of showing that no material issues of fact remain that would defeat his or her claim of qualified immunity." *Id.; see also Powell,* 891 F.2d at 1457.

■ This procedure must be modified slightly, however, when the plaintiff's claim contains a subjective element, such as the defendant's purpose, motive, or intent. Prior to *Harlow,* the qualified immunity standard had both a subjective and an objective component. *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975). The subjective component focused on the good faith of the official and relieved him from liability if he did not actually know his conduct was unconstitutional and did not act with malicious intent. *Harlow* eliminated any consideration of the defendant's intent as it relates to his knowledge of the law, *see Halperin v. Kissinger,* 807 F.2d 180, 186 (D.C.Cir. 1986), but did not preclude consideration of the defendant's intent when his state of mind is an essential element of the plaintiff's substantive claim, *Pueblo Neighborhood Health Ctrs.,* 847 F.2d at 648.

When a defendant moves for summary judgment asserting he is qualifiedly immune and his state of mind is an element of the plaintiff's claim, he must do more than merely raise the immunity defense; he "must make a prima facie showing of the 'objective reasonableness' of the challenged

conduct." *Lewis v. City of Ft. Collins,* 903 F.2d 752, 755 (10th Cir.1990) (citing *Pueblo Neighborhood Health Ctrs.,* 847 F.2d at 649; *Martin v. D.C. Metro. Police Dep't,* 812 F.2d 1425, 1434 (D.C.Cir.1987)). If the defendant makes this prima facie showing, the plaintiff must then produce specific evidence of the defendant's culpable state of mind to survive summary judgment. *Pueblo Neighborhood Health Ctrs.,* 847 F.2d at 649.

■ At the time Defendants drafted the affidavits at issue, the law was clearly established that an officer would violate a plaintiff's Fourth and Fourteenth Amendment rights by knowingly or recklessly making a false statement in an affidavit in support of an arrest or search warrant, if the false statement were material to the finding of probable cause. *See Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978); *Krohn v. United States,* 742 F.2d 24, 31 (1st Cir.1984) (applying *Franks v. Delaware* standard to civil rights case involving arrest warrant). The law also was clearly established that "to knowingly or recklessly omit from an arrest affidavit information which, if included, would have vitiated probable cause," would violate a plaintiff's Fourth and Fourteenth Amendment rights. *Stewart v. Donges,* 915 F.2d 572, 582–83 (10th Cir.1990).

■ A reckless disregard for the truth in the context of an alleged Fourth Amendment violation under *Franks v. Delaware* is the same as that in the context of an alleged First Amendment violation. A plaintiff must prove that "the affiant 'in fact entertained serious doubts as to the truth of his' allegations." *United States v. Williams,* 737 F.2d 594, 602 (7th Cir.1984) (quoting *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968)), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985); *accord DeLoach v. Bevers,* 922 F.2d 618, 622 (10th Cir.1990), *cert. denied,* — U.S. —, 112 S.Ct. 65, 116 L.Ed.2d 41 (1991). "Recklessness may be inferred from omission of facts which are 'clearly critical' to a finding

of probable cause."[4] *DeLoach,* 922 F.2d at 622 (quoting *Hale v. Fish,* 899 F.2d 390, 400 (5th Cir.1990); *United States v. Reivich,* 793 F.2d 957, 961 (8th Cir.1986)).

■ Because the state of mind with which Defendants allegedly acted was an element of Plaintiff's claim, Defendants had to make a prima facie showing that their actions were objectively reasonable. Defendants, however, did not submit any materials in support of their Motion for Summary Judgment. They did not file any affidavits attesting to their good faith, *Martin,* 812 F.2d at 1434, or establishing the objective reasonableness of their conduct, *Lewis,* 903 F.2d at 755. Instead, Defendants merely argued that Plaintiff could not establish their culpable state of mind and that any alleged false statements or omissions were not material to a finding of probable cause. On this record, it does not appear that Defendants made a prima facie showing that their conduct was objectively reasonable.

■ Moreover, Plaintiff came forward with specific evidence from which one could infer that Defendants recklessly made false statements in, and omitted material information from, their affidavits. As Plaintiff's expert witness said in an affidavit attached to Plaintiff's Brief in Opposition to Defendant–Police Officers' Motion for Summary Judgment, "the only material evidence in [Officer Ferguson's] affidavit linking [Plaintiff] to the offenses enumerated in the affidavit is the alleged identification of [Plaintiff] by one of the victims, [Victim # 1]." R. Vol. I, Doc. 6, Ex. G at 2. Plaintiff pointed to evidence within Defendants' knowledge that clearly indicated Victim # 1 could not positively identify Plaintiff, or any one else, as her assailant.

In denying Defendants' Motion for Summary Judgment, the district court focused on the following statements or omissions that it concluded were actionable: (1) Detective Robinson's statement that Victim # 1 said she "had an opportunity to observe the subject closely," R. Vol. I, Doc. 6, Ex. B at 1; (2) Detective Robinson's state-

---

4. This statement, of course, assumes that the affiant was aware of such omitted facts.

ment that Victim #1 " 'knew it was him,' " when she saw Plaintiff in the grocery store on June 25, 1986, *id.;* (3) Detective Robinson's failure to mention Detective O'Connell's interview with Victim #1; and (4) Officer Ferguson's statement that he was "not aware of any other facts which would tend to exculpate [Plaintiff]," *id.* at Ex. D, p. 3. The district court also concluded that Officer Ferguson's affidavit suffered from the same deficiencies as Detective Robinson's affidavit.

Defendants argue that Detective Robinson's statement that Victim #1 had an opportunity to observe her assailant closely is true, as evidenced by her ability to describe the assailant in some detail. The statement is clearly misleading, however, in light of the information Detective Robinson omitted from his affidavit: that the man was wearing a handkerchief that concealed his face from the bridge of his nose down, and Victim #1 only saw him briefly by the light of her dome light while he was crouched down in her back seat. The omitted information casts substantial doubt on Victim #1's ability to identify Plaintiff as her assailant and, therefore, is material to a finding of probable cause.

Defendants also contend that Detective Robinson's statement that Victim #1 said she "knew it was him" when she saw Plaintiff on June 25, 1986, is true. In their interview with Victim #1 after her encounter with Plaintiff on June 25th, however, neither Detective Robinson nor Officer Locke wrote down what Victim #1 told them. Officer Locke testified in his deposition that if Victim #1 had positively identified her assailant, he would have written it down. Furthermore, although Victim #1 allegedly identified Plaintiff as her assailant in this interview, the record does not reflect that the GPD took any action on this information until October 24, 1986. Both of these pieces of circumstantial evidence are sufficient to create an issue of fact as to whether Victim #1 actually made the statement Detective Robinson attributed to her in his affidavit. The statement is material, as it constituted a positive identification of Plaintiff as Victim #1's assailant. Also, one could infer from the

GPD's failure to act on the information Victim #1 provided in the interview that Detective Robinson did not believe the information was sufficient to link Plaintiff to the crime.

Defendants contend that pursuant to *Easton v. City of Boulder,* 776 F.2d 1441 (10th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986), they were not required to discuss in their respective affidavits any of the statements Victim #1 made in her interview with Detective O'Connell because even if those statements were inconsistent or contradictory to the statements she allegedly made in the June 25th and October 24th interviews, they would not nullify probable cause. Defendants' interpretation of *Easton* is too broad.

*Easton* involved an alleged sexual assault on two young boys by a man who lived in their apartment complex. When the first detective interviewed the boys separately, each described going to the man's apartment where a nonviolent sexual assault occurred and later going to the laundry room with the man where he made a tent out of a blanket and assaulted one of the boys again. Each boy identified the man's apartment to the detective and together they took the police to the laundry room. There, the detective found a blanket, which the boys said was the one the man used to make a tent. The detective then contacted the building manager to determine who lived in the apartment the boys had identified. The manager said Daniel Easton lived in the apartment. *Id.* at 1443–44.

A week later, a second detective, who was experienced with juveniles, interviewed one of the boys again. At that time, the boy recalled only the incident in the laundry room. Although he denied being in the man's apartment, he identified the same apartment as the man's residence. The boy's description of what occurred in the laundry room remained consistent with his earlier account, however, and his description of the man was consistent with that given by the complex manager. At the end of the interview, the boy's stepfa-

ther saw a man coming out of his apartment across the complex and asked the boy if that man was the assailant. The boy responded "yes." Thereafter, police approached the man and asked him his name. He identified himself as Daniel Easton. *Id.* at 1444.

Later that day, the detective interviewed the *other boy again*. His account of the laundry room incident was consistent with all other accounts. He again related that the boys were in the man's apartment, but denied that any assault took place there. He described the man as having lighter hair than the other boy did. *Id.* After the interview, the detective who first interviewed the children drafted an affidavit for Easton's arrest with the assistance of the second detective. The detective did not reveal in his affidavit that the first boy's statements as to whether he had been in Easton's apartment and whether he had been assaulted in Easton's apartment were contradictory, or that the two boy's descriptions of the assailant's hair color varied slightly. *Id.* at 1449.

We concluded that the omitted inconsistencies

> d[id] nothing to undermine the solid core of the children's statements regarding the laundry room assault and the location of the perpetrator's apartment. Nor d[id] they detract from the detectives' impression, based on personal observation of [the first boy's] demeanor and behavior, that his statements were spontaneous and revealed knowledge of things that a child his age could not possibly possess had an event of the kind described not occurred.

*Id.* at 1450. We also noted that "[t]he detectives did not need [the first boy's] statement about a further assault in the man's apartment to establish probable cause *and did not rely on it in the affidavit they submitted to [the judge]." Id.* at 1450–51 (emphasis added). We therefore held that "because the evidence excluded in no way alter[ed] the fact that the evidence included state[d] probable cause, the warrant was valid, whatever the intent of the

officers, and Easton suffered no harm." *Id.* at 1451.

In contrast, the omissions here directly undermine Victim # 1's alleged identification of Plaintiff as her assailant. That identification was virtually the only evidence linking Plaintiff to either of the assaults, and without it, there would be no probable cause to believe Plaintiff was the assailant. Defendants' interpretation of *Easton* as holding that an officer need never report an inconsistency in the statements of a victim or witness is completely unreasonable. *See also Stewart*, 915 F.2d at 583 (holding law was clearly established in December of 1985 that the victim's alleged recantation of his accusation was highly material to a finding of probable cause).

■ On appeal, Defendants argue that Officer Ferguson's statement that he was unaware of any evidence exculpating Plaintiff was true. They contend that exculpatory evidence is that which positively eliminates the defendant as the perpetrator, and none of the evidence Plaintiff claims Officer Ferguson omitted from his affidavit concerning Victim # 1's ability to identify Plaintiff and how well Plaintiff fit Victim # 1's description of the assailant tended to show Plaintiff could not be the assailant. Appellant's Reply Brief at 8–13. Defendants did not raise this argument as to the meaning of "exculpatory" evidence in the district court, however, so we will not consider it on appeal. *Gillihan v. Shillinger*, 872 F.2d 935, 938 (10th Cir.1989); *see also Mountain Fuel Supply v. Reliance Ins. Co.*, 933 F.2d 882, 887 (10th Cir.1991) ("We are not obligated to address an argument which was not made in the district court, nor even in this court until the reply brief.").

Officer Ferguson knew Victim # 1 made statements to Detective O'Connell that undermined her ability to identify Plaintiff as her assailant and he knew that Plaintiff did not fit Victim # 1's description of the assailant in all respects, including that he had hazel rather than "icy blue eyes," yet he not only failed to set forth this information in his affidavit, he positively stated he was

unaware of any facts tending to exculpate Plaintiff. Officer Ferguson's statement was not only false and misleading, but material to the finding of probable cause.

In his affidavit, Plaintiff's expert witness, a former police officer and chief investigator for a District Attorney's Office, opined that under the circumstances,

the information relied upon by [Officer Ferguson] in the preparation of the affidavit for issuance of an arrest warrant was so obviously contraindicated as to the positive identification of [Plaintiff] by [Victim #1], that to include it in the affidavit without qualification or explanation constitutes a deviation from what an objective and reasonable police officer would consider appropriate in like circumstances.

R. Vol. I, Doc. 6, Ex. G at 4. Detective Robinson's affidavit suffered from the same deficiencies as Officer Ferguson's affidavit.

The statements Defendants made in their affidavits and the information they omitted from those affidavits concerned facts that were "clearly critical" to a finding of probable cause. A factfinder could infer that Defendants made the statements and omitted the information with reckless disregard for the truth. *See DeLoach*, 922 F.2d at 622.

### III.

In conclusion, Defendants failed to make a prima facie showing that their conduct was objectively reasonable, while Plaintiff pointed to specific evidence that Defendants' conduct violated clearly established rights of which a reasonable officer would have known. Therefore, the district court properly denied Defendants' Motion for Summary Judgment. The ruling of the United States District Court for the District of Colorado is AFFIRMED, and the action is REMANDED for further proceedings.