FILED
United States Court of Appeals
Tenth Circuit

**March 31, 2008**

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PEDRO HERNANDEZ, III; CARMEN
HERNANDEZ; ENRIQUE
HERNANDEZ; YESENIA RAMIREZ;
and SELENA HERNANDEZ, a minor
child, by and through her parents and
next friends, ENRIQUE
HERNANDEZ and YESENIA
RAMIREZ,

     Plaintiffs-Appellants,

v.

ROBERT CONDE,

     Defendant-Appellee,

   and

DEAN AKINGS; ROD WEBER;
BRIAN DOUGHERTY; R. SCOTT
HARPER; CHRIS SMEE,

     Defendants.

----------------------

UNITED STATES OF AMERICA,

     Movant.

No. 06-3433
(D.Ct. No. 05-CV-01103-JTM)
(Kansas)

---

**ORDER AND JUDGMENT**[*]

---

[*]   This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

Before **HARTZ** and **GORSUCH**, Circuit Judges, and **BRIMMER**,[**] District Judge.

The Plaintiffs filed this civil rights action claiming that the Defendant, Robert Conde, violated their right to be free from unreasonable searches and seizures. The district court granted the Defendant's motion for summary judgment based on qualified immunity. ROA, Vol. I, B18; Hernandez v. Conde, 442 F. Supp. 2d 1131 (D. Kan. 2006).

## I.     Background

This lawsuit revolves around a warrant to search the wrong house. The warrant was issued on May 15, 2003, to search the residence at 340 Heizer Street, Great Bend, Kansas. ROA, Vol. II, S321. Pedro and Carmen Hernandez lived at 340 Heizer at the time. Their son Enrique, along with his wife, Yesenia, and their daughter, Selena, also lived at 340 Heizer. ROA, Vol. I, K87. Pedro, Carmen, Enrique, Yesenia and Selena are the Plaintiffs. Robert Conde is the only Defendant remaining in the action.[1]

[**]The Honorable Clarence A. Brimmer, United States District Judge for the District of Wyoming, sitting by designation.

[1]The Record on Appeal includes a second order entered by the district court granting summary judgment to the other five Defendants. Though not relevant to the determination of this appeal, background facts in that order help clarify the Plaintiffs' assertions in this appeal. The district court explained in its second order that Pedro and Carmen have five adult children -- Martha, Baudilio, Esteban, Ovidio and Enrique. Baudilio lives at 336 Heizer, which is immediately next door to 340 Heizer. Martha and her husband Manuel Tavarez live at 301

(continued...)

-2-

On the morning of May 15, 2003, a woman named Karen Byerly, a/k/a Karen Henderson, appeared at the Great Bend Police Department and offered to act as a cooperating individual to assist the police in the purchase of illegal drugs. ROA, Vol. II, R154, S302. The police department declined Byerly's offer of assistance, but provided the Kansas Bureau of Investigation (KBI) the opportunity to use Byerly as a cooperating individual. Id. KBI Special Agent in Charge, Kelly Ralston, met with Byerly and assigned Special Agents Brian Carroll and Robert Conde to commence an investigation and attempt to use Byerly to purchase drugs. Id.

Byerly believed she could arrange a cocaine buy through an individual named Travis Underwood. Byerly contacted Underwood and he agreed to purchase drugs for Byerly and Agent Conde. Underwood was not aware that Byerly and Agent Conde were working for a law enforcement agency. Id. at R154-55, S303.

---

[1](...continued)
Fruit, Great Bend. Their home backs up to the alley behind 340 Heizer. Manuel Tavarez owns the properties at 316, 328 and 340 Heizer. Martha and Manuel's son is Ivan Tavarez. Ivan Tavarez has lived with his parents at 340 Heizer in the past, as recently as the year 2000. In 2000, Ivan Tavarez moved to 328 Heizer. In 2001, three Defendants who are no longer in this case (Akings, Weber, and Harper) were involved in the arrest of Ivan Tavarez during an investigation for aggravated assault for placing a handgun against the neck of, and threatening to kill, the victim. Ivan Tavarez was arrested at 328 Heizer with an SKS assault rifle. He reported that he lived at 340 Heizer at that time. The area around 340 Heizer is prone to violence and crime. ROA, Vol. I, J51-52; Hernandez v. Conde, 442 F. Supp. 2d 1141, 1145 (D. Kan. 2006). The confidential informant in this case, Karen Byerly, also lived on Heizer Street. Id. at D41i.

At approximately 6:30 p.m. on May 15, 2003, after receiving a phone call from Underwood, Agent Conde and Byerly picked up Underwood. After a brief conversation, Underwood guided Agent Conde to a parking lot at 705 Heizer Street. Id. at R155, S303. Agent Conde parked his vehicle in the parking lot and gave Underwood $160 in marked currency to purchase cocaine. Id. at R155, S304.

On the north end of Heizer Street, there are railroad tracks. Just south of the tracks, sit two mobile home trailers. Id. at R256. The trailers lie on the east side of Heizer. Id. The first trailer south of the tracks is 340 Heizer. Id. at R156, S304. The second trailer to the south is 336 Heizer. Baudilio Hernandez lives in the second trailer. Id. at 256-57.

The critical chain of events began shortly before Underwood left the vehicle. According to Agent Conde, Underwood indicated that he was going to, or in the direction of, the first trailer. Id. at S354. (Plaintiffs vehemently dispute this statement.) It is undisputed that Underwood walked south on Heizer Street, crossing the railroad tracks. Id. at R156, R256-57. Agent Conde, however, lost sight of him when he crossed the railroad tracks. Id. at R156, S304. Underwood testified that a few train cars may have obstructed the view between Agent Conde's vehicle and the second trailer. Id. at R258. To get a better view of where Underwood had gone, Agent Conde moved his vehicle. Id. at R156, S304.

Agent Conde testified that he did not see Underwood until approximately

ten minutes later when Underwood exited the trailer at **340 Heizer.**  Id. at R352.

(Plaintiffs also fiercely dispute this statement.)  Underwood, however, testified in

his deposition that he had actually walked to Baudilio's trailer to make the drug

buy (**336 Heizer**).  Id. at R256-57.

Underwood returned to the vehicle and told Agent Conde that the deal went

well and handed the cocaine to Agent Conde.  Id. at R157, S304.  Agent Conde

drove Underwood to the pick up location and handed him $20 for his help.  Agent

Conde returned to his office and tested a portion of the substance Underwood had

purchased.  It tested positive for cocaine.  Agent Conde advised Agent Ralston of

the drug buy and Ralston instructed Agent Conde to obtain a search warrant.  Id.

at R158, S305.

Agent Conde drove back to the location where the cocaine buy had taken

place with three other law enforcement officers.  Id.  Agent Conde then returned

to the KBI Office where he prepared an affidavit and application for a search

warrant.  In the affidavit, Agent Conde described the location of the sale of

cocaine as follows:

> 340 Heizer Street, Great Bend, Kansas.  The residence is a white
> trailer house with blue/green trim.  The residence sits immediately
> South of the railroad tracks on Heizer Street and on the East side of
> Heizer Street.  The trailer house is the first one South of the railroad
> tracks and the front door faces to the North....

Id. at S316.  Later in his affidavit, Agent Conde recounted that:

> . . . [Special Agent] Conde drove to the Peterson Mechanical Inc.

company located at 705 South Heizer Street. SA Conde parked in the gravel parking lot and gave Underwood $160. Underwood told SA Conde that he (Underwood) was walking **to the white trailer house with blue/green trim on the east side of Heizer Street, just south of the railroad tracks** . . . .

Id. at R319 (emphasis added). Agent Conde then explained that he lost sight of Underwood:

Underwood walked from the parking lot at 705 Heizer and walked south on Heizer Street, crossing the railroad tracks. SA Conde turned the car around and lost sight of Underwood momentarily.

After approximately 10 minutes had elapsed, **SA Conde observed Underwood emerge from the trailer** and cross the railroad tracks towards SA Conde's position. SA Conde kept Underwood in sight the whole time since Underwood emerged from the trailer.

Id. (emphasis added).

Based on the affidavit and application for a search warrant, a Barton County District Court judge issued a warrant late in the evening on May 15, 2003. Id. at R321-22. The search warrant was executed by the Great Bend Police Department's Special Service Team on the Plaintiffs' residence at 340 Heizer Street. Id. at R159, S306. Agent Conde was not directly involved in the forced entry or initial execution of the search warrant, but assisted in the search after the residence was cleared. Id.

Although not relied upon in the determination of this appeal, the district court's summary judgment order involving the other five Defendants provides background concerning the execution of the warrant which further helps clarify

-6-

the Plaintiffs' assertions in this appeal. According to the district court, the warrant was executed at 11:50 p.m on the night of May 15, 2003. A member of the special services team (SST) used a "knock and announce" entry based on the belief that the execution might be dangerous. An SST member knocked on the door. After receiving no response, the door lock was disabled with a shot lock shell and a flash bang distraction device was tossed through the door. After it went off, the team members entered the trailer. ROA, Vol. I, J60.

In the process of securing the residence, a struggle ensued with Pedro Hernandez and two officers. At the time, Pedro was wearing a pocket knife. In the course of the struggle, Pedro was shot by an SST member, causing a flesh wound to his back. Pedro was handcuffed and walked outside. Plaintiffs state that he was ultimately transported by ambulance to medical facilities for treatment of his gunshot wound. Id. at K87. An agent also struggled with Enrique, brought him to the ground, and handcuffed him. Id. at J62. Carmen was also handcuffed and escorted out of the trailer. Yesenia was not handcuffed. Carmen, Enrique, Yesenia and Selena were all transported to the KBI office for questioning. They returned to their home at approximately 6:00 a.m., but were not allowed to enter until 7:00 or 8:00 a.m. when the search was complete. Id. at J64-65. The officers found no drugs, no drug buy funds, nor any other evidence of drug activity during the search. ROA, Vol. II, S355 .

When later questioned in a deposition about his grounds for obtaining a

search warrant, Agent Conde admitted that if he had not seen which trailer Underwood actually exited, there would not be sufficient probable cause to obtain a search warrant.  ROA, Vol. I, L109.  In his deposition, Agent Conde recalled Underwood stating the following immediately before the drug buy:

> Q.    No, what words did Underwood actually say to you while you were in the car before he got out on May 15th of 2003?
>
> A.    I can't recall with certainty, but it's like do you, and he was gesturing, do you see that house with green, or something like that? And he said, you see that house there behind it, or something, or the other house? And he said, it's there, it's right by there, some words to that type of effect.  So that's not verbatim, I don't remember exactly how he phrased it.
>
> Q.    Okay.  Did you put what he actually said verbatim into the search warrant application?
>
> A.    No, I wrote that he said "to".
>
> Q.    You wrote that he said "to", but in fact he never said the word "to", did he?
>
> A.    My understanding is "to" means he's going in that direction of, that's what I meant, he's going in the direction of that place.
>
> Q.    You could have written he was going in the direction of that place, couldn't you?
>
> A.    Well, my understanding is, I mean, that means the same thing.
>
> Q.    You could have also written what he'd actually said was that he was going by these two trailer houses?
>
> A.    I could have wrote -- I mean, that's -- as I understood he said he was going to there, towards that direction.
>
> Q.    And he never actually said blue green trim did he?

> A.    I don't know what he said at the time.  I think he said it had green trim, or the house with the green or something like that.

ROA, Vol. II, S354-55 (quotation marks added).

Agent Conde brought Underwood in for questioning on approximately May 19, 2003.  During the interview, Underwood learned that he could potentially be charged with the sale of cocaine and learned that Agent Conde was a KBI agent.  ROA, Vol. II, R259.  In his deposition, Underwood recalled that during the questioning, Agent Conde asked which trailer Underwood had entered:

> Q.    What did he ask, do you remember?
>
> A.    He asked me if I had gone into the white and green trailer, and I said, no.
>
> Q.    Okay.
>
> A.    I told him I went into the peach trailer.  I guess that would be the color.
>
> Q.    Okay.  Was there any other conversation about which trailer you had gone into, besides that?
>
> A.    He asked me several times.  I mean, you know, made sure I didn't go into the green and white trailer, but that was about it.

Id. at R260.

In his deposition, Underwood was also asked if there would have been any reason for Agent Conde and Byerly not to be able to see which of the two trailer houses Underwood entered.  Underwood answered as follows:

> Q.    Did they park right outside of the trailer house or?

-9-

A.      No, they parked across the tracks, by Heizer Park.

Q.      Could you see the vehicle from where you went to Baudilio's house?

A.      Slightly, yeah.

Q       Slightly?

A.      I could see it from the mailbox, from his mailbox.

Q.      Okay.  Was the trailer to the north of Baudilio's, did it obstruct your view at all, as far as where they were parked?

A.      No.

Q.      Okay.

A.      There was -- there was a few train cars that might have, but that would have been it.

Q.      Would there have been any reason for Mr. Conde and Karen to not be able to see which of the two trailer houses you were walking into?

A.      Oh, there's a slight possibility, yeah.  When I walked back, I walked right by the trailer and went out.

Q.      Walked right by the one to the north of it?

A.      Yes.

Id. at R257-58.  Underwood estimated that he walked 150 yards to Agent Conde's

vehicle:

Q.      Okay.  As you were exiting the trailer house door could you see where Mr. Conde and Karen were parked?

A.      Yes.

Q.      Okay.  Could you tell whether or not they were looking at you?

-10-

A. Huh-uh, no, I couldn't.

Q. Okay. Did they come pick you up or did you walk to the car?

A. I walked to the car.

Q. Okay. How far away?

A. 150 yards, maybe.

Q. 150 yards or 150 feet, do you know?

A. 150 yards.

Id.

On August 25, 2005, Agent Conde stated in interrogatory responses that he did not know the identity of the confidential informant used in the May 15, 2003 drug buy. Id. at R223. Shortly before the close of discovery on January 12, 2006, Agent Conde amended his interrogatory responses and disclosed Karen Byerly as the confidential informant who had been present during Underwood's cocaine purchase. Id. at R229. The Plaintiffs, however, did not depose Byerly until June 7, 2006. ROA, Vol. I, E44.

At least two audio recordings were made of Agent Conde's contact with Underwood and Karen Byerly on May 15, 2003. ROA, Vol. II, R264-65. The recordings included the time frame when Underwood exited the vehicle and then returned to the vehicle approximately ten minutes later. The first recording was made by Agent Conde with a hand-held recorder on a micro cassette. The second recording was made at the KBI office over a "wire." Id.

Agent Conde testified that he unintentionally recorded over the micro cassette recording he made. This erased the recording from the time Underwood exited the vehicle through the end of the drug transaction. Id. The recording made at KBI was turned over to Agent Conde. Agent Conde, however, lost that recording. Id.

## II. Standard of Review

The Plaintiffs maintain that the district court improperly found that Agent Conde was entitled to qualified immunity. We review the district court's grant of summary judgment on qualified immunity de novo, applying the same standard the district court should apply under Fed. R. Civ. P. 56(c). Reeves v. Churchich, 484 F.3d 1244, 1250 (10th Cir. 2007), petition for cert. filed, 76 U.S.L.W. 3199 (U.S. Jul. 23, 2007) (No. 07-466). Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In conducting our review, we view the evidence and draw reasonable inferences from the evidence in the light most favorable to the nonmoving party. Reeves, 484 F.3d at 1250.

## III. Qualified Immunity Discussion

To state a civil rights claim under 42 U.S.C. § 1983, Plaintiffs must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. Bruner v. Baker, 506 F.3d 1021, 1026 (10th Cir. 2007).

-12-

The Plaintiffs allege that Agent Conde violated their constitutional rights by including false information in his affidavit for a warrant to search their home. Agent Conde, in response, contends that he is protected from Plaintiffs' claims under the doctrine of qualified immunity.

When applicable, qualified immunity shields public agents not only from liability at trial, but also from the very burdens associated with trial. Beard v. City of Northglenn, Colo., 24 F.3d 110, 113 (10th Cir. 1994). This prophylactic protection is afforded governmental officials on the premise that they can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages and only if unjustified lawsuits are quickly terminated. Id. at 114.

The Supreme Court adopted the current standard to determine whether qualified immunity applies in Harlow v. Fitzgerald, 457 U.S. 800 (1982). Before Harlow, qualified immunity contained an objective and subjective component. Pueblo Neighborhood Health Centers, Inc. v. Losavio, 847 F.2d 642, 645 (10th Cir. 1988). Because the subjective component often required public officials to go to trial to defend insubstantial suits, the Supreme Court adopted an objective test for qualified immunity: a public official performing discretionary functions is shielded from liability for all civil damages so long as the official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow, 457 U.S. at 818.

When Agent Conde drafted his affidavit for a search warrant, the law was clearly established that an officer would violate a plaintiff's Fourth and Fourteenth Amendment rights by knowingly or recklessly making a false statement in an affidavit in support of a search warrant, if the false statement were material to the finding of probable cause. Franks v. Delaware, 438 U.S. 154, 155-56 (1978); Bruning v. Pixler, 949 F.2d 352, 357 (10th Cir. 1991). It was also a clearly established violation of a plaintiff's Fourth and Fourteenth Amendment rights to knowingly or recklessly omit from an arrest affidavit information which, if included, would have vitiated probable cause. Stewart v. Donges, 915 F.2d 572, 582-83 (10th Cir. 1990).

Although the objective test in Harlow is the general standard, the test must be modified when "the determination of the 'objective' reasonableness of an official's conduct rests on establishing whether the defendant acted with an impermissible motive or intent - a highly 'subjective' factual element." Lewis v. City of Fort Collins, 903 F.2d 752, 755 (10th Cir. 1990). Where, as here, the existence of a violation of the clearly established law depends on the government official's subjective intent, the Court applies a two-step analysis. First, the defendant must make a prima facie showing of the objective reasonableness of the challenged conduct. Id. If the defendant makes a prima facie showing of objective reasonableness of his or her conduct, the plaintiff may avoid summary judgment only by pointing to specific evidence that the official's actions were

improperly motivated.   Pueblo Neighborhood Health Ctrs., Inc., 847 F.2d at 649; Lewis, 903 F.2d at 758.

A.     Prima facie showing of objective reasonableness

This Court agrees with the district court that Agent Conde made a prima facie showing that he was objectively reasonable in his description of the events in the affidavit for the search warrant.  Agent Conde produced evidence to show that the confidential informant, Karen Byerly, thought that she could arrange Travis Underwood "to score for her."  ROA, Vol. II, S361.  Underwood obliged and purchased cocaine for Byerly and Agent Conde.  Id.  Agent Conde testified that Underwood indicated that he was going to the white trailer house with the green trim.  Id. at S351, S354.  Agent Conde did not remember the exact words Underwood used, but recalled Underwood gesturing to and describing the "house with green" (340 Heizer).  Id. at S354.  After Underwood left the vehicle, Agent Conde lost sight of him.  When he thought he could move without raising suspicion, Agent Conde moved his vehicle.

Agent Conde did not see Underwood go into any location, but he recalled seeing him emerge from 340 Heizer, the first trailer to the south of the railroad tracks.  According to Agent Conde, Byerly was not looking in Underwood's direction when Underwood walked out of the trailer.  Id. at S352.

Prima facie evidence is evidence that will establish a fact or sustain a judgment unless contradictory evidence is produced.  Black's Law Dictionary (8th

-15-

ed. 2004). Although Plaintiffs insist that Agent Conde's prima facie case is based solely on disputed facts, this Court finds otherwise. The undisputed facts show that Underwood walked south across the railroad tracks, that Agent Conde lost sight of him, that there may have been train cars obstructing Conde's view of the trailers, and that the trailers were approximately 150 yards from Agent Conde's vehicle. Underwood himself testified that Agent Conde may not have been able to see which trailer he entered, and that he walked right past the trailer at 340 Heizer on his way back to Conde's vehicle. The Court finds that there is sufficient undisputed evidence to establish that Agent Conde was objectively reasonable in his belief, even if mistaken, that Underwood exited 340 Heizer. The Plaintiffs may therefore avoid summary judgment only by producing specific factual support for their claim of unconstitutional motive. Pueblo Neighborhood Health Centers, Inc., 847 F.2d at 649.

B.      Knowing or reckless false statement or omission in affidavit

Plaintiffs assert that Agent Conde included two material false statements in his affidavit and that he omitted critical information from the affidavit. The false statements allegedly included were that: 1) Underwood told Agent Conde he was walking to the white trailer with blue-green trim, which described 340 Heizer Street, and 2) Agent Conde saw Underwood emerge from 340 Heizer and walk directly back to Agent Conde's vehicle. According to the Plaintiffs, the critical omission was that Karen Byerly told Agent Conde that Underwood did not exit

-16-

340 Heizer but instead exited the trailer house to the south of 340 Heizer.

Plaintiffs must produce specific evidence that Agent Conde acted knowingly or with reckless disregard to the truth in preparing his affidavit. To establish a reckless disregard for the truth, the Plaintiffs must prove that Agent Conde in fact entertained serious doubts as to the truth of his allegations. Bruning, 949 F.2d at 357. Recklessness, however, may be inferred from the omission of facts which are clearly critical to a finding of probable cause. Id.

Plaintiffs identify the following disputed facts which they urge show that Agent Conde knowingly or recklessly included false information or omitted critical information from his affidavit:

1)      Underwood never indicated physically or verbally that he was walking to or towards 340 Heizer Street;

2)      Underwood never entered the trailer at 340 Heizer Street, so Agent Conde could not have seen him exit the trailer;

3)      Karen Byerly saw Underwood exit the trailer south of 340 Heizer Street and told Agent Conde what she saw; and

4)      Agent Conde failed to preserve the recordings of the drug transaction.

The Court initially notes that the Plaintiffs' third asserted fact, that Karen Byerly saw Underwood exit the trailer south of 340 Heizer Street and told Agent Conde what she saw, is not supported by the record. As evidence of this assertion of fact, Plaintiffs rely on a statement made by Byerly and rely on Byerly's deposition testimony. Byerly's statement is in the form of a transcript of a

-17-

recorded conversation between Byerly and Plaintiffs' investigator. ROA, Vol. II, R188. The transcript was not sworn to by Byerly and much of the recording was inaudible. The transcript of the recorded interview is hearsay which is not reliable and not admissible for purposes of a summary judgment motion.[2] Fed. R. Evid. 801, 802; Fed. R. Civ. P. 56(e); Adams v. American Guar. & Liab. Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000) ("Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment[.]"); Estate of Sisk v. Manzanares, 262 F. Supp. 2d 1162, 1167 n.3 (D. Kan. 2002) ("A transcript of an interview is classic hearsay and, therefore, is inadmissible in ruling on a motion for summary judgment unless properly offered under one of the exceptions to the hearsay rule.").

Plaintiffs also rely on the deposition testimony of Byerly that she saw Underwood enter the "second" trailer on Heizer and that she told Agent Conde what she had seen. ROA, Vol I, D41h. Byerly's deposition, however, is not part of the record in this appeal. The deposition is attached to the Plaintiffs' memorandum in support of a motion to amend the district court's order granting summary judgment to Agent Conde. Id. at D34. The district court denied the Plaintiffs' motion to amend. The district court refused to consider the deposition,

---

[2]Byerly's statements to the Plaintiffs' investigator reflect the precise reason behind their inadmissibility. The investigator's coaxing manner of questioning was extremely suggestive. For example, in asking Byerly what she recalled, the investigator told her, "Okay. Well, we didn't want to - (inaudible) those people got injured pretty bad." ROA, Vol. I, M115.

concluding that Plaintiffs had not met the criteria for amending the judgment since Byerly's deposition was not newly discovered evidence. The court ruled that, "With respect to the [Byerly] deposition, plaintiffs do not demonstrate that counsel made a diligent effort to discover the evidence . . . . The court is not persuaded that the plaintiffs' 'new' evidence requires consideration." ROA, Vol. I, E44.

The Plaintiffs did not challenge or address in their opening brief the district court's determination that Byerly's deposition was not newly discovered evidence which could be considered in a motion to alter or amend judgment. Because the district court's refusal to consider the deposition was not raised by the Plaintiffs in their opening brief, the deposition is consequently not a part of the record on appeal. Tran v. Trustees of State Colleges in Colorado, 355 F.3d 1263, 1266 (10th Cir. 2004) ("Issues not raised in the opening brief are deemed abandoned or waived.")

The remaining facts which Plaintiffs contend are sufficient to establish an improper motive on Agent Conde's behalf are that Underwood never indicated that he was walking towards 340 Heizer Street, that Underwood never actually went into 340 Heizer Street, and that Agent Conde failed to preserve evidence. The Court is not persuaded, as Plaintiffs insist, that these facts show that Agent Conde knew his affidavit was false or in fact entertained serious doubts as to the truth of his allegations.

In reviewing these facts, the Court is called on to strike a fair balance between the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority, and the countervailing need to provide a realistic avenue for vindication of constitutional guarantees. Pueblo Neighborhood Health Centers, Inc., 847 F.2d at 648. The Court is not convinced that Plaintiffs' assertions, that Underwood never indicated that he was walking towards 340 Heizer and never actually went into 340 Heizer, evidence that Conde was improperly motivated.

It does appear that Agent Conde was mistaken in his belief that Underwood was planning to enter the first trailer and that Agent Conde saw Underwood exit the first trailer. Under the Fourth Amendment, however, our inquiry is focused neither on the existence nor the consequence of Agent Conde's error, but on the intention behind it. Beard v. City of Northglenn, Colo., 24 F.3d at 116. The testimonies of both Agent Conde and Underwood only indicate that Agent Conde misunderstood Underwood and mistook which trailer he exited. His misunderstanding and mistake alone are insufficient to show a culpable state of mind.

Plaintiffs persist that Agent Conde's failure to preserve the audio recordings of Agent Conde's contact with Underwood and Byerly is circumstantial evidence that Agent Conde acted knowingly or with reckless disregard to the truth in preparing the affidavit for a search warrant. The general

-20-

rule is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction. Aramburu v. Boeing Co., 112 F.3d 1398, 1407 (10th Cir. 1997). The adverse inference, however, must be predicated on the bad faith of the party destroying the records. Id. Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case. Id.

The only evidence in the record with respect to the audio recordings is that Agent Conde recorded over the micro cassette recording and that Agent Lyon said he turned the wire recording made at KBI over to Agent Conde, and Agent Conde testified he did not know where the tape was. Again, this limited evidence shows, at the most, that Agent Conde's loss of the recordings was negligent. Negligence in losing evidence alone does not give rise to any adverse inference that the tapes were unfavorable. Id. Without an inference that the tapes were unfavorable, there can be no second inference that Agent Conde destroyed them because of a culpable state of mind.

Although the Court does not find evidence of a culpable state of mind, the Court is left with grave concerns about the quality of information upon which Agent Conde's affidavit was based and upon which the search was ultimately conducted. The district court noted that the Heizer Street area was prone to violence and familiar to members of the Great Bend Special Services Team. The

Court believes that Agent Conde's conduct in failing to clarify exactly where Baudilio lived and in which trailer the drug buy had taken place was certainly careless. Such carelessness is deplorable and the Court assumes the lack of care is not characteristic of KBI investigations. The Court agrees with the district court, however, that the Plaintiffs have not presented specific facts to show that Agent Conde's actions were more than careless. That is, the evidence does not show that he acted knowingly or with reckless disregard to the truth when he stated in his affidavit that Underwood indicated he was going to 340 Heizer and that Agent Conde saw Underwood exit 340 Heizer. Although the Plaintiffs imply that Agent Conde was motivated by a belief that a family drug enterprise existed, the implication is not supported by the evidence.

We find that the district court properly granted summary judgment to Agent Conde and the judgment of the district court is accordingly AFFIRMED.

**Entered by the Court:**

**Clarence A. Brimmer**
United States Circuit Judge

06-3433 - *Hernandez v. Conde*

**HARTZ**, Circuit Judge, dissenting:

I respectfully dissent. The majority opinion fully and lucidly sets forth the evidence in the record. Therefore, my remarks can be brief.

In my view summary judgment was improper because a reasonable juror could be persuaded by Plaintiffs' evidence that (1) Agent Conde's affidavit contained false information that was necessary to establish probable cause to search their home and (2) Agent Conde included the false information knowingly or recklessly. *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). Two sentences in the affidavit showed that Plaintiffs' home on 340 Heizer was where Travis Underwood purchased drugs: (1) "Underwood told SA Conde that he (Underwood) was walking to the white trailer house with blue/green trim on the east side of Heizer Street, just south of the railroad tracks [a description of 340 Heizer]." (2) "After approximately 10 minutes had elapsed, SA Conde observed Underwood emerge from the trailer [at 340 Heizer] and cross the railroad tracks towards SA Conde's position." But Mr. Underwood testified at his deposition that he did not enter 340 Heizer and made the purchase in a nearby trailer. It is a natural inference from this testimony that Agent Conde did not see Mr. Underwood "emerge" from 340 Heizer and that Mr. Underwood had not told Agent Conde that he was going to the trailer at that address to make a purchase.

If a juror believed Mr. Underwood, then the juror could infer not only that the quoted statements in Agent Conde's affidavit were false but also that they were

knowingly or recklessly false. *See DeLoach v. Bevers*, 922 F.2d 618, 622 (10th Cir. 1990) ("Recklessness may be inferred from omission of facts which are 'clearly critical' to a finding of probable cause."). In particular, Agent Conde either saw Mr. Underwood "emerge" from the trailer at 340 Heizer or he did not. To say that he did when he did not is to make a knowingly false statement. Moreover, the loss of the two recordings of Agent Conde's conversation with Mr. Underwood could be viewed as evidence that Agent Conde acted with a culpable state of mind. Not only did Agent Conde admit to recording over the microcassette recording of the conversation but he also lost the KBI recording. Although these actions may have been merely negligent, one could reasonably believe that such sloppiness was highly unlikely and infer that Agent Conde wished to conceal tangible evidence of his misconduct. *See Ashcraft v. Tennessee*, 327 U.S. 274, 278 (1946) ("Wilful concealment of material facts has always been considered as evidence of guilt."); *Spies v. United States*, 317 U.S. 492, 499 (1943) (wilfulness of evasion of taxes can be inferred from destruction of books or records); 2 Kenneth S. Broun, McCormick on Evidence § 265 (6th ed. 2006).

Accordingly, I would hold that there are genuine issues of material fact precluding summary judgment.