**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAUL A. STOOT, SR.; TAMMIE L.
STOOT, husband and wife, and as
parents and guardians of Paul A.
Stoot II; and PAUL A. STOOT II, a
minor child,
            *Plaintiffs-Appellants,*

        v.

CITY OF EVERETT, a municipal
corporation; OFFICER JON A.
JENSEN; JANE DOE JENSEN, and the
marital community thereof,
            *Defendants-Appellees.*

No. 07-35425

D.C. No.
CV-05-01983-TSZ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Thomas S. Zilly, Senior District Judge, Presiding

Argued and Submitted
October 23, 2008—Seattle, Washington

Filed August 13, 2009

Before: Barry G. Silverman and Marsha S. Berzon,
Circuit Judges, and James C. Mahan,* District Judge.

Opinion by Judge Berzon

---

*The Honorable James C. Mahan, United States District Judge for the
District of Nevada, sitting by designation.

**COUNSEL**

Michael J. Andrews, Cogdill Nichols Rein Wartelle Andrews, Everett, Washington, for the plaintiffs-appellants.

Robert L. Christie, Christie Law Group, PLLC, Seattle, Washington, for the defendants-appellees.

**OPINION**

BERZON, Circuit Judge:

Based solely on statements by a four-year-old that she had been sexually abused when she was three, Everett Police

Detective Jon Jensen seized and interrogated plaintiff Paul Stoot II for almost two hours in the principal's office at Paul's school. Near the end of the interrogation, Paul stated that he had molested the victim three times. The confession was then used to file criminal charges against Paul in juvenile court.

A state court subsequently dismissed the charges, holding that the confession had been coerced and that the four-year-old victim was incompetent to testify at trial. After the charges against Paul were dismissed, the Stoot family filed this action under 42 U.S.C. § 1983, asserting violation of Paul's rights under the Fourth, Fifth, and Fourteenth Amendments. Specifically, the Stoots alleged that (1) Jensen seized Paul without probable cause in violation of the Fourth Amendment, as the victim's statements, standing alone, were unreliable; (2) Jensen coerced a confession that was later used against Paul in a criminal proceeding, in violation of the Fifth Amendment; and (3) Jensen's interrogation techniques were so coercive as to violate substantive due process under the Fourteenth Amendment. The Stoots also asserted a claim of municipal liability against the City of Everett based on its policies and practices regarding interrogation of juvenile suspects and child victims, as well as a state law claim of outrage.

We conclude that the Stoots have alleged viable claims under both the Fourth and Fifth Amendments, as Jensen seized Paul without probable cause and then allegedly coerced incriminating statements that were later used against Paul in a criminal proceeding. We nonetheless affirm the district court's grant of summary judgment to defendants on the Fourth Amendment claim on the basis of qualified immunity, as the pertinent law was not clearly established at the time of the violations. The Fifth Amendment claim, however, may proceed in district court, as the aspects of the pertinent law not clearly established at the time of the confession did not affect Jensen's role in bringing about the violation. Finally, we affirm the district court's grant of summary judgment to defendants on the Stoots' remaining claims, as Jensen's con-

duct did not rise to the level of a substantive due process violation or a state law claim for outrage and the Stoots have failed to provide evidence supporting municipal liability.

## FACTS & PROCEDURAL HISTORY

On December 23, 2003, Nicki Johnson contacted the City of Everett Police Department to report that her four-year-old daughter, A.B., had been sexually abused by an acquaintance, Paul Stoot II ("Paul"). Officer Margaret Anders responded to the call and briefly interviewed Nicki. Nicki stated that four days earlier, she had walked into A.B.'s bedroom and found her with "her pants down . . . touching herself." Nicki asked A.B. why she was doing that, and A.B. eventually responded "because Paul touched me there." Nicki then asked her to explain exactly what happened, and A.B. replied that "[Paul] pulled down his pants and pulled his little thing out and pulled her pants down and put it on her." According to Nicki, A.B. indicated that this had happened five times between June and September 2002, while A.B. was living with the Stoot family.

Nicki told Officer Anders that "Paul" referred to Paul Stoot II, the 14-year-old son of Paul Stoot, a local pastor ("Pastor Paul"). Nicki described the neighborhood in which the Stoot family resided, and Officer Anders verified this information by finding an address for Paul Stoot in a local directory. She then instructed Nicki not to question her daughter any further about the incident, wrote her report, and passed it along to City detectives. Anders noted that "[t]hroughout my interaction with her, [Nicki] appeared to be a credible person who was not exaggerating or fabricating allegations. I had no reason to doubt her or the version of events that she conveyed to me." Anders's report concluded her involvement in the case.

Anders's report was assigned to Detective Jonathan Jensen the next day. At the time of the investigation, Jensen had been a police officer for twenty-four years, including five years in the Special Assault Unit, which focuses on cases of child sex-

ual abuse. Jensen began his investigation by contacting Nicki, who described the same conversation with her daughter previously relayed to Anders. Based on his "background and training," Jensen "believed that [Nicki] had done [a] reliable job of obtaining truthful and accurate information from her daughter without leading her or planting a suggested story." Nicki agreed to allow Jensen to interview her daughter.

Jensen interviewed A.B. outside the presence of her mother or anyone else. He did not videotape or audio-record the interview. He did take notes, but threw them out shortly after preparing his police report. The account of the interview in his report thus constitutes the only contemporaneous description in the record of Jensen's interview with A.B.

According to the report, Jensen began the interview by "telling [A.B.] some things about [himself] in a rapport building exercise." He then asked her, "Has anyone ever touched you in a way you don't like?" A.B. answered, "No." Jensen then began working with sketches of a little boy and a little girl, asking A.B. to identify various body parts. After pointing to the little boy's penis, Jensen asked if she knew what that was called, to which A.B. responded that she didn't remember, but that girls weren't supposed to touch it. Jensen then asked, "Have you ever seen another boy's penis before?" A.B. responded, "A boy named Paul. He has one of these. He put it on my privates, on the bed he did, at [the Stoot's house]." A.B. said this happened on five days.

Jensen proceeded to ask a number of questions about Paul. A.B. stated that "[Paul] told me to taste [his penis]" one time in the bathroom, but that she "didn't touch it." She said that they went into the bedroom, and "he put his poo poo on me." Jensen asked A.B. if Paul touched her anywhere else, to which A.B. responded that "he sits on me and bounces when he puts his poo poo on me." She said that she "wouldn't like it. Sometimes, I like it but I don't like it. Sometimes, it gets stuck."

A.B.'s answers were at times confused or contradictory. Jensen asked her, for example, "Did Paul's penis touch your face?" to which A.B. answered, "No." Jensen then asked her, "Did you touch his poo poo?" A.B. denied that she did, but then began talking about another boy, "Preston." She answered, "No. I told you I didn't. He usually puts his poo poo inside here (she pointed to her vaginal area). Preston puts his poo poo in my pee pee." Jensen asked her who Preston was, and A.B. responded that he was a six-year-old friend who lives far away. Jensen then "told her [he] wanted to talk more about Paul and not talk about Preston anymore."

Jensen also asked A.B. several times whether Paul licked her. The first time, A.B. responded, "No. He just put his poo poo in my pee pee." A moment later, however, Jensen asked her if there was anything she forgot to tell him, to which she answered, "He actually has licked me." A.B. also stated, "Actually, I did lick his poo poo," although she had previously denied doing so several times.

Following the interview, Jensen talked to Nicki, who told him that A.B. had stayed with Paul Stoot and his family from June 2002 to September 2002 while Nicki dealt with some financial problems.[1] Jensen then called the local school district to find out which school Paul attended. Because he now considered Paul "a suspect in a rape of child case," Jensen also notified Child Protective Services of his investigation.

On January 15, 2003, Jensen called Bree Nelson, Principal of Voyager Middle School, to arrange an on-campus interview with Paul. Before interviewing Paul, Jensen spoke with

---

[1]Jensen did not take any steps to verify that A.B. had, in fact, lived with the Stoots during this time period. If Jensen had contacted Pastor Paul to confirm Nicki's account of their relationship, he likely would have learned that the Stoots discontinued A.B.'s enrollment in the family's daycare service two months before Nicki made her allegations, because Nicki owed them roughly $3,000.

two Snohomish County prosecutors "to make sure [he] was current on the legal standards for interviewing juvenile suspects that were at least 12 years old." According to Jensen,

> From these discussions, [he] picked up two points of information; (1) if the juvenile requests his parents during the interview, treat the request the same as one for legal counsel, and (2) give the juvenile *Miranda* warnings and have him sign the waiver form (if applicable) even for non-custodial interviews since the interview was to take place at a school where the child was not free to leave.

Acting on this advice, Jensen told Nelson that she did not need to contact Paul's parents before the interview. Rather, Jensen indicated that he would contact them afterwards.

When Jensen arrived at the school, Vice Principal Bailey pulled Paul out of class and took him to the principal's office, where Jensen was waiting for him. At this point, the parties' version of events begins to differ.[2] According to Jensen,

> I introduced myself and said I wanted to talk to [Paul]. He said okay. I sat down with him at a small table, and produced a rights form. I explained I was required to read him his rights before I could talk to him. He shook his head up and down. I read his rights . . ., and he signed the form to indicate that he understood, and signed that he was willing to talk to me.

After Paul waived his rights, Jensen states that he questioned Paul about A.B.'s allegations for close to two hours and that — after denying any wrongdoing at least 13 times — Paul

---

[2]As with his interview of A.B., Jensen did not record or preserve notes from his interview with Paul.

eventually confessed. In Jensen's words, he successfully employed "the interviewing technique of blaming the victim":

> I kept talking to him about A.B. starting the contacts, and about her being sexually aggressive. I kept telling him that it would have been normal for him to respond to her touching him. . . . I kept talking to him, and I finally said, 'You touched her vagina with your fingers, didn't you.' He said, 'Yes.' I asked, 'How many times?' He said, 'Three times on her vagina.'

According to Jensen, Paul also voluntarily agreed to provide a written statement. In that statement, Paul admitted that "[o]ne time I did touch her on her vagina for like 5 seconds," although he maintained that "[n]either of us pulled down our pants and rubbed on each other," that "she never put her mouth on my penis and I never put my mouth on her vagina," and that "[s]he never seen my penis, only when she walked in the bathroom and grabbed it but I didn't let her." In a note at the bottom of the statement, added at Jensen's instruction,[3] Paul indicated that he "rubbed on vagina 2 times with clothes on then one time for a couple of second with clothes off."

The Stoots provide a very different account of Paul's interview with Jensen. According to the Stoots, after Paul's repeated denials, Jensen "adjusted his tactics, and coerced admissions from Paul." They assert that this coercion "included the making of impermissible threats of heightened punishment if Paul denied guilt, and impermissible promises

---

[3]In his declaration, Jensen claims that "[Paul] wrote out the text of the statement without any direction from me." Jensen's police report contradicts his declaration. In the report, Jensen states, "I reviewed [Paul's written statement]. I found where he said he touched A.B. one time on her vagina. It had been my recollection he said he touched her three times on her bare skin. . . . I asked him to clarify this by adding a sentence to the end of his statement."

of leniency if he admitted guilt." Paul claims, for example, that after almost two hours of interrogation,

> I'm thinking, man, he's not taking no for an answer and I don't know what to do. I don't know what to say besides tell him, yes, I did it. And I thought that I wasn't going to be able to walk out that room if I kept telling him no.

At that point, Paul alleges that Jensen told him,

> [I]f I say no — if I keep saying no and denying it, then this could lead to court and you could go to jail for three to five months. . . . And if I just said that, yes, that all of this will be over, this won't lead to court. No charges will be pressed and you won't be going to jail and that I will only have to see a counselor."[4]

After these false promises, the Stoots contend, "Paul's will was overcome by these tactics and the physically imposing Detective Jensen," and Paul falsely confessed. In Paul's words,

> I had never been so scared in my life as when he said he didn't believe me when I told the truth. I wanted my mom or dad or a teacher there, but I thought I just had to sit there and do what he said. He just kept drilling me saying he did not believe me again and again. . . . I felt I had to lie and tell him what he wanted to get out of that room.

The Stoots assert that Jensen's interviewing tactics also violated Miranda, as Paul lacked the capacity to consent to the interrogation. They allege that although Jensen "verbally read

---

[4]Jensen specifically denies this accusation, contending that he "never made any promises to Paul II about what might happen to him."

[Paul] his 'Miranda' rights, and instructed [Paul] to sign the waiver form provided," later psychological and developmental testing confirmed that Paul "lacked the capacity to understand or assert his legal rights." Paul thought that the right to remain silent, for example, meant that he "couldn't say anything. I had to be quiet and I just had to listen to the cop." The right to an attorney, in his mind, meant that "after we had the interview, I could appoint an attorney. And if I couldn't, then the State will give me one." According to the Stoots, Paul's failure to understand his *Miranda* rights should have been apparent to Jensen at the time of the interview.

After the interview, Jensen sent Paul back to class. On July 2, 2004, Snohomish County prosecutor Janice Ellis filed an Information charging Paul with child molestation in the first degree. An Affidavit of Probable Cause, filed with the Information, relied solely on (1) Nicki's statements to police; (2) Jensen's interview of A.B.; and (3) Paul's confession. At an arraignment hearing a few weeks later, the Superior Court found that "probable cause exists for the charge" and released Paul on his own recognizance on various conditions, including that he "always be supervised by an adult who is aware of the charge."

On November 3, 2004, the Superior Court held a hearing pursuant to Washington Criminal Rule 3.5 (the "CrR 3.5 hearing") to determine the admissibility of Paul's confession.[5]

---

[5]Criminal Rule 3.5 provides, *inter alia*, that "[w]hen a statement of the accused is to be offered in evidence, the judge at the time of the omnibus hearing shall hold or set the time for a hearing . . . for the purpose of determining whether the statement is admissible. . . . It shall be the duty of the court to inform the defendant that: (1) he may, but need not, testify at the hearing on the circumstances surrounding the statement; (2) if he does testify at the hearing, he will be subject to cross examination with respect to the circumstances surrounding the statement and with respect to his credibility; (3) if he does testify at the hearing, he does not by so testifying waive his right to remain silent during the trial; and (4) if he does testify at the hearing, neither this fact nor his testimony at the hearing shall be mentioned to the jury unless he testifies concerning the statement at trial." Wash. Super. Ct. Crim. R. 3.5(a), (b).

After hearing testimony from Paul, Jensen, and expert witnesses, the court concluded that Paul "lacked the capacity to understand his rights and . . . could not make an intelligent or knowing waiver of his rights." The court found that because Paul did not ask for clarification of the meaning of his rights and did not display any apparent confusion at the time of the *Miranda* warnings, "it would have appeared to Detective Jensen that [Paul] understood his rights." Based on the totality of the circumstances, however, including Paul's age, experience, background, and intelligence, the court concluded that any waiver of his rights was invalid.

The Superior Court also addressed the allegedly coercive nature of Jensen's interrogation techniques, finding that "it is not per se coercive to use what has been described . . . as Reid techniques [*i.e.*, blaming the victim] for interrogation." The court noted, however, that Paul also claimed that Jensen "made certain promises of leniency if he confessed and implied more serious consequences if he refused to confess." Although Jensen denied making these threats or promises, the court found Paul's testimony on this point persuasive, as Paul "lacked the experience and knowledge to fabricate the nature of the promises made" and "was not sophisticated enough to create a scenario of promised counseling in lieu of other punishment." The court therefore concluded that the statements made by Paul in his interview with Jensen "were the product of impermissible coercion," and were therefore inadmissible.

The Superior Court also heard testimony regarding A.B.'s competence as a witness. The court learned that A.B. had a history of hallucinations and panic attacks, that she had been prescribed medication for anxiety neurosis, and that doctors had previously referred her to a child mental health specialist. Based on these concerns as well as A.B.'s testimony, the court found that A.B. "lacked the mental capacity at the time of the occurrence . . . to receive accurate impressions" and "lacked memory sufficient to retain independent recollection of any occurrences supporting the charged offense." The court

thus concluded that A.B. was not competent to testify at Paul's trial, and excluded all "alleged hearsay statements made on or about December 19, 2003 [the date of A.B.'s statements to Nicki], and January 8, 2004 [the date of Jensen's interview]." The court also granted Paul's motion to dismiss the charges against him with prejudice, holding that "as a matter of law the undisputed material facts fail to establish a *prima facie* case of guilt."

After the charges against Paul were dismissed, the Stoot family brought this action against Jensen and the City of Everett.[6] As noted, the Stoots alleged various federal constitutional claims under § 1983, as well as a claim against the City for municipal liability and a state law claim for intentional infliction of emotional distress.[7] The district court granted defendants' motion for summary judgment on all claims. Specifically, the district court held that (1) Jensen was entitled to qualified immunity on the Stoots' Fourth Amendment claims because "[a] reasonable officer in [his] position could have believed that the statements by the victim established probable cause, notwithstanding the significant amount of time between the accusations by A.B. and the alleged molestation, and A.B.'s young age"; (2) the Stoots "failed to make out a cognizable § 1983 claim for violation of [Paul's] Fifth Amendment privilege against compelled self-incrimination" because Paul's statements were never used against him in a criminal trial; (3) Jensen's interrogation of Paul was not so "unduly coercive or improper" as to violate Paul's right to substantive due process under the Fourteenth Amendment; (4) the Stoots "failed to identify facts in support of their claim that a government custom or policy resulted in a violation of Paul II's constitutional rights," foreclosing any claim for

---

[6]The Stoots filed this action in Washington Superior Court on November 22, 2005. Defendants subsequently removed it to federal court.

[7]The Stoots also initially claimed a violation of Paul's Sixth Amendment right to counsel, but did not oppose summary judgment on that claim and do not raise it on appeal.

municipal liability; and (5) the Stoots' claims for outrage or intentional infliction of emotional distress failed as a matter of law because Jensen's actions were not "outrageous in character" or "extreme in degree."

The Stoots timely appealed.

## ANALYSIS

We review the district court's grant of summary judgment *de novo*, viewing the facts in the light most favorable to the non-moving party. *Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007). Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## I. FOURTH AMENDMENT SEIZURE

[1] "By virtue of its 'incorporation' into the Fourteenth Amendment, the Fourth Amendment requires the States to provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty." *Baker v. McCollan*, 443 U.S. 137, 142 (1979). In this case, defendants concede that on plaintiff's version of the facts, which we must credit for purposes of summary judgment, Jensen's detention and interrogation of Paul constituted a seizure, and we agree. *See Doe v. Heck*, 327 F.3d 492, 509-10 & n.15 (7th Cir. 2003). We must therefore decide whether Jensen had probable cause to seize Paul and, if not, whether Jensen is entitled to qualified immunity because the law was not clearly established at the time of the interrogation.[8]

---

[8]Before the Supreme Court's recent decision in *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009), courts addressing an official's claim of qualified immunity were required to follow the two-step sequential inquiry established in *Saucier v. Katz,* 533 U.S. 194, 202 (2001), asking first

## A. PROBABLE CAUSE

**[2]** "Probable cause exists where the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (internal quotation marks omitted); *see also Ornelas v. United States*, 517 U.S. 690, 696 (1996); *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Further, "[b]ecause many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable [people], acting on facts leading sensibly to their conclusions of probability." *Brinegar*, 338 U.S. at 176.

The Stoots argue that Jensen violated Paul's Fourth Amendment rights by relying solely on "the confused statement from a 4-year-old girl made during an improperly conducted interview" to justify Paul's seizure. They note that A.B. provided "vastly different reports about what was alleged to have happened, when, where, and with whom" —

whether the plaintiff alleged a violation of a constitutional right and, second, whether that right was clearly established at the time of the conduct at issue. *Pearson* relieved courts of their obligation always to follow this sequence, permitting "[t]he judges of the district courts and the courts of appeals . . . to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818.

Although rigid adherence to the *Saucier* protocol is no longer required, the Court was careful to note that *Saucier*'s two-step procedure is "often beneficial," as it "promotes the development of constitutional precedent." *Id.*; *see also id.* at 821-22. Such is the case here, where we have not previously addressed whether a police officer may rely *solely* on the statements of a very young victim of alleged sexual abuse to establish probable cause to seize a potential suspect.

inconsistencies that should have raised "serious concerns about the veracity and reliability of the allegation made by A.B." And they maintain that a reasonable officer, presented with A.B.'s contradictory account of alleged abuse, should have engaged in a more thorough investigation to corroborate A.B.'s allegations before seizing and interrogating Paul. Had Jensen done so, the Stoots contend, he quickly would have learned that A.B. was "a confused young girl, with a long history of hallucinations, vaginal issues, and reports of sexual abuse by other persons," whose statements, standing alone, were not sufficiently reliable to constitute probable cause.[9]

---

[9]The Stoots present two other arguments in support of their Fourth Amendment claim, neither of which has merit. First, they argue that defendants conceded in the proceedings below that Jensen lacked probable cause. This argument is based on the district court's characterization of an exchange with counsel at oral argument, in which defense counsel admitted that "reasonable minds could differ as to whether Detective Jensen had probable cause to arrest Paul II before the questioning at the school." An admission that reasonable minds could differ, however, is not a concession that the opposing party is correct. Moreover, defendants clearly do not concede that Jensen lacked probable cause on appeal, as they address the issue at some length in their brief.

Second, the Stoots challenge Jensen's interviewing techniques, arguing that his interview with A.B. was riddled with "leading and/or coercive questions" that undermined the reliability of her answers. This argument is squarely foreclosed by our decision in *Devereaux v. Perez*, 218 F.3d 1045 (9th Cir. 2000), *reh'g en banc*, *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001), in which we rejected a foster parent's claim that "employing improper interview techniques to child witnesses . . . resulted in an innocent person being falsely accused of child sexual abuse." *Id.* at 1053. We held that a person suspected of child sexual abuse does not enjoy any constitutional right "to have child witnesses . . . interviewed in a particular manner or pursuant to a certain protocol." *Id.* Although the plaintiff in *Devereaux* failed to identify any specific flaws with the defendants' interviewing techniques, we noted that even if he had, "the interviewing conduct occurred in a grey area of investigative procedure as to which there were, and probably still are, less than clearly established legal norms." *Id.* at 1053-54. Thus, even if Jensen employed improper techniques in his interview with A.B., that would not give rise to a separate constitutional claim. Rather, the question before us remains whether the information available to Jensen at the time of the seizure was sufficiently reliable to constitute probable cause.

**[3]** We agree with the Stoots that A.B.'s statements were not sufficiently reliable to establish probable cause to seize Paul. Law enforcement officers may obviously rely on statements made by the victims of a crime to identify potential suspects. But such information does not, on its own, support a finding of probable cause if the information is not reasonably trustworthy or reliable. *See Cortez v. McCauley*, 478 F.3d 1108, 1116-22 (10th Cir. 2007) (en banc); *United States v. Shaw*, 464 F.3d 615, 623-26 (6th Cir. 2006); *Clay v. Conlee*, 815 F.2d 1164, 1168 (8th Cir. 1987). In this case, three factors, taken together, compel the conclusion that the statements made by A.B. to Jensen were not sufficiently trustworthy or reliable to establish probable cause on their own.

**[4]** First, A.B. was four years old at the time of the interview, and she was reporting events that purportedly occurred when she was three. Common experience counsels extreme caution in crediting detailed recollections of events said to have occurred at such an extremely young age, particularly those reported over a year later by a child still very young. *See Shaw*, 464 F.3d at 624.

**[5]** Second, A.B. changed her answers at several points during the interview. She began by stating that no one had touched her in a way she didn't like, but proceeded to make several allegations — in response to specific questions from Jensen — that Paul had touched her in ways she "wouldn't" or "didn't" like. She also initially denied that Paul had licked her or that she had licked him, but then reversed herself on both counts by the end of the interview, claiming both that "[Paul] actually has licked me" and that "[she] did lick his poo poo."

**[6]** Third, A.B. at one point confused Paul with another boy. In response to a question about Paul, A.B. stated that "Preston puts his poo poo in my pee pee." She did so right after denying that Paul's penis had touched her face, or that she had touched Paul's penis.

**[7]** These three circumstances, considered together, point to the need for further investigation and corroboration to establish probable cause. In cases involving very young child victims, the courts have repeatedly emphasized the need for some evidence in addition to the statements of the victim to corroborate the allegations and establish probable cause. *See Shaw*, 464 F.3d at 624 (discussing this line of cases and noting that, in each case, "the court specifically noted that a child's testimony was not the only evidence supporting probable cause"). The need for further investigation was particularly acute in this case, in which a four-year-old victim struggled to provide a coherent description of abuse that allegedly occurred eighteen months earlier, when she was three years old. *Cf. id.* ("We are not aware . . . of any situation in which the uncorroborated hearsay statement of a child as young as three, standing alone, has been considered sufficient to establish probable cause.").

Defendants maintain that the statements of child victims — even if internally conflicting — can establish probable cause to arrest a suspect. For support, they rely primarily on the Tenth Circuit's decision in *Easton v. City of Boulder*, 776 F.2d 1441 (10th Cir. 1985).

In *Easton*, the parents of a three-year-old boy reported that he had been molested the previous day. *Id.* at 1443. After interviewing the alleged victim among others, the police secured a warrant for Easton's arrest. *Id.* at 1446. The district attorney subsequently decided not to press formal charges. *Id.* Easton then brought suit under § 1983, challenging the reliability of the child testimony used by the police. *Id.* at 1449.

The Tenth Circuit rejected Easton's claim that the police unreasonably relied on the statements of the child victim, noting that "[i]n a great many child molestation cases, the only available evidence that a crime has been committed is the testimony of children" and that "[t]o discount such testimony from the outset would only serve to discourage children and

parents from reporting molestation incidents and to unjustly insulate the perpetrator of such crimes from prosecution." *Id.* The court therefore flatly repudiated a *per se* rule that the testimony of very young child victims may not be relied upon at all in a probable cause determination. *Id.*

The court also rejected Easton's claim that "apparent inconsistencies" in the child testimony rendered the police officers' reliance on those statements unreasonable. Although it described this argument as "the one point which does lend some merit to [Easton's] case," the court began by explaining that "when examining informant evidence used to support a claim of probable cause . . . the skepticism and careful scrutiny usually found in cases involving informants . . . is appropriately relaxed if the informant is an identified victim or ordinary citizen witness." *Id.* The court noted that while certain statements of the child victim were undeniably self-contradictory, those inconsistencies "[did] nothing to undermine the solid core of the children's statements regarding [one instance of assault] and the location of the perpetrator's apartment." *Id.* at 1450. The court therefore held that the police had probable cause to arrest Easton once they had completed their interviews.

*Easton* simply cannot bear the weight placed upon it by defendants in this case. Although defendants cite *Easton* for the general proposition that police may reasonably rely solely on the partially-conflicting statements of child victims, the investigating officers in that case did no such thing. To the contrary, the police interviewed *both* the victim and his five-year-old playmate, who had allegedly witnessed one of the two incidents of molestation. 776 F.2d at 1443. The Tenth Circuit emphasized that the officer's "separate interview of [the victim's playmate] also corroborated all the facts given by [the victim] and by his father." *Id.* The court also stressed that the two children "together led [the officer] to the laundry room where the second assault took place," and that the officer there observed the blanket and black vinyl chair that both

boys had mentioned in their statements. *Id.* at 1443-44. The officer also interviewed the apartment manager, learning that Easton was a loner with few friends who "had been observed in the past staring at the children playing in the common area of the apartment complex." *Id.* at 1444 (internal quotation marks omitted).

The police in *Easton* therefore had substantial evidence corroborating the victim's statements of alleged abuse, rendering the officers' reliance on those statements reasonable. *Id.* at 1449-50. In this case, by contrast, defendants submit that A.B.'s statements standing alone, without *any* corroborating evidence, provided probable cause to arrest Paul. *Easton* provides no support for that proposition.[10]

[8] We hold that Jensen could not rely solely on the uncorroborated, inconsistent statements of this very young child to establish probable cause to arrest Paul. Given A.B.'s age at the time of the purported events and at the time she reported them, as well as the inconsistencies noted above, A.B.'s statements, standing alone, were insufficient to establish probable cause to seize Paul.[11]

---

[10]Indeed, the Tenth Circuit has cited its opinion in *Easton* for precisely the opposite principle, describing Easton as a case involving statements by child victims that were "independently corroborated by police investigation." *Cortez*, 478 F.3d at 1119.

[11]Requiring officers to conduct some further investigation to corroborate the allegations of a young child victim would not impose any substantial burden on law enforcement. In this case, for example, there were several, easy approaches Jensen could have used to attempt to corroborate A.B.'s statements, approaches which also would have allowed him to learn that A.B. and her mother were less than credible. Jensen could have verified that A.B. had lived with the Stoots and why she was living there; determined whether A.B. could successfully identify Paul; and sought medical information to assess whether A.B.'s 18-month-old allegations were supported by any physical evidence. As it turned out, any such effort to corroborate A.B.'s statements likely would have cast serious doubt on her allegations, as her mother was engaged in an ongoing financial dispute with the Stoots at the time of her allegations, and A.B. had a history of mental health problems.

## B. Qualified Immunity

Even if Jensen did violate Paul's Fourth Amendment rights by seizing him without probable cause, Jensen may still be entitled to qualified immunity if his conduct " '[did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Defendants argue, and the district court held, that Jensen is entitled to qualified immunity because "[a] reasonable officer in Detective Jensen's position could have believed that the statements by the victim established probable cause." Defendants argue, in other words, that although Jensen was mistaken in his belief that A.B.'s statements established probable cause, the mistake was a reasonable one.

**[9]** The doctrine of qualified immunity "operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). In this case, the Stoots have not cited a single case squarely holding that an officer cannot rely solely on the statements of a child sexual assault victim obtained during a personal interview to establish probable cause, nor are we aware of one. To the contrary, although two circuit courts of appeals have held that uncorroborated hearsay statements of a child victim are insufficient to establish probable cause, both of those opinions *could* be read to imply — although we do not so read them — that the officers lacked probable cause primarily because they had not personally interviewed the victim and therefore had no basis upon which to assess credibility. *See Cortez*, 478 F.3d at 1119; *Shaw*, 464 F.3d at 624.

**[10]** In this case, of course, Jensen personally interviewed the victim and determined that she was credible before he seized Paul. Although we disagree with his assessment of A.B.'s credibility and read the applicable case law as consis-

tent with our conclusion, none of the cases cited by the Stoots put him directly on notice that his decision to rely on A.B.'s statements, without any corroboration, was unlawful. We therefore affirm the district court's judgment that he is entitled to qualified immunity on the Stoots' Fourth Amendment claim.

## II. FIFTH AMENDMENT CLAIMS

The Stoots also allege that Jensen violated Paul's Fifth Amendment right against self-incrimination by coercing a confession during the interrogation at Paul's school. Defendants argue — and the district court held — that the Stoots cannot state a claim under the Fifth Amendment because Paul's statements were never used against him at trial. For the reasons set forth below we disagree.

### A. "USE" OF A STATEMENT IN A "CRIMINAL CASE"

Our consideration of this coerced confession issue begins with a fairly recent Supreme Court case, *Chavez v. Martinez*, 538 U.S. 760 (2003), which establishes the parameters of the problem we face but does not solve it. *Chavez* addressed whether a former criminal suspect could sue a police officer under § 1983 for coercing a confession in violation of his Fifth Amendment rights. Specifically, the police failed to give the suspect, Oliverio Martinez, any *Miranda* warnings, and interrogated him under circumstances alleged to be extremely coercive. Martinez made several incriminating statements but was never charged with any crime. *Id.* at 764. He subsequently brought suit under § 1983 for violation of his Fifth Amendment right "not to be compelled in any criminal case to be a witness against himself" and his Fourteenth Amendment substantive due process right to be free from coercive questioning. *Id.* at 765 (internal quotation marks omitted).

[11] In a set of opinions, none of which commanded a majority on the Fifth Amendment issue, the Court held that

coercive police questioning does not violate the Fifth Amendment, absent use of the statements in a criminal case. *See id.* at 766 ("We fail to see how, based on the text of the Fifth Amendment, Martinez can allege a violation of this right, since Martinez was never prosecuted for a crime, let alone compelled to be a witness against himself in a criminal case.") (Thomas, J., joined by Rehnquist, C.J., O'Connor, J., and Scalia, J.); *id.* at 777-78 (describing "the core of the guarantee against compelled self-incrimination" as "the exclusion of any such evidence" and declining to "expand protection of the privilege . . . to the point of [ ] civil liability" in the absence of a more "powerful showing" that the conduct at issue placed this "core guarantee, or the judicial capacity to protect it," at risk) (Souter, J., joined by Breyer, J.). The Court held that unlawful police interrogation techniques might give rise to a substantive due process claim under the Fourteenth Amendment, *see id.* at 773 (plurality opinion of Thomas, J.); *id.* at 779 (Souter, J.); *id.* at 787 (Stevens, J.); *id.* at 799 (Kennedy, J.), but that the Fifth Amendment was not violated unless and until allegedly coerced statements were used against the suspect in a criminal case.

*Chavez* poses but does not decide the issue we face, as the Court had no occasion to explicate the sort of "use" in a "criminal case" that gives rise to a Fifth Amendment violation. The plurality stated that "a 'criminal case' at the very least requires the initiation of legal proceedings," but, as Martinez never faced criminal charges, did not decide "the precise moment when a 'criminal case' commences." *Id.* at 766-67. Justice Souter's concurring opinion also did not discuss when a statement has been "used" in violation of the Fifth Amendment, focusing instead on Martinez's failure to demonstrate that a damages remedy was necessary in every case of police coercion to protect the Fifth Amendment right. *See id.* at 778-79 (Souter, J., concurring).

[12] The Stoots' Fifth Amendment claim in this case falls squarely within the gray area created by *Chavez*. Unlike Mar-

tinez, who was never charged with any crime, Paul's statements were used against him in (1) the Affidavit filed in support of the Information charging him with child molestation; (2) a pretrial arraignment and bail hearing (the CrR 3.2 hearing);[12] and (3) a pretrial evidentiary hearing (the CrR 3.5 hearing) to determine the admissibility of his confession. The question is whether these forms of reliance on Paul's statements constitute "use" in a "criminal case" under *Chavez*. We conclude that (1) and (2) above do constitute such "use."

Although we have not, after Chavez, addressed the scope of the "use" concept for Fifth Amendment purposes, other circuit courts have, with mixed results. The Third, Fourth, and Fifth Circuits have applied *Chavez* to bar recovery under the Fifth Amendment unless the allegedly coerced statements were admitted against the defendant *at trial. See Burrell v. Virginia*, 395 F.3d 508, 513-14 (4th Cir. 2005) (holding that because plaintiff did not allege "any *trial* action that violated his Fifth Amendment rights[,] . . . *ipso facto*, his [§ 1983] claim fails") (emphasis in original); *Murray v. Earle*, 405 F.3d 278, 285 (5th Cir. 2005); *Renda v. King*, 347 F.3d 550,

---

[12]Following oral argument in this case, we asked the Stoots to provide documentation supporting their assertion that Paul's statements were used against him at arraignment on July 23, 2004. The Stoots have provided us with copies of the clerk's minute entry and a transcript of the July 23 hearing, as well as a copy of Washington Superior Court Rule 3.2, which governs pretrial release. We take judicial notice of these documents and conclude, as the Stoots suggest, that the Superior Court necessarily took Paul's statements as described in the Information and supporting documents into account when setting conditions for his release. Rule 3.2 specifically requires the court to make a finding of probable cause or release the accused without conditions, and the court did so. *See* Wash. Super. Ct. Crim. R. 3.2. To determine appropriate conditions for release, the court is to consider, *inter alia*, the "nature of the charge" based on "the available information." Wash. Super. Ct. Crim. R. 3.2(e). In this case, it appears that the only "available information" on the nature of the alleged offense was the Information and Affidavit of Probable Cause which, as noted above, included Paul's statements; the oral hearing did not involve the factual allegations concerning the offense at all.

552 (3d Cir. 2003). Emphasizing the Court's description of the Fifth Amendment privilege against self-incrimination as a "trial right," *see Withrow v. Williams*, 507 U.S. 680, 692 (1993), these courts have held "that it is the use of coerced statements during a criminal trial, and not in obtaining an indictment, that violates the Constitution." *Renda*, 347 F.3d at 559; *see also Burrell*, 395 F.3d at 513-14 & n.4.

The Seventh and Second Circuits disagree. In *Sornberger v. City of Knoxville, Illinois*, 434 F.3d 1006 (7th Cir. 2006), the Seventh Circuit addressed the claims of a couple mistakenly arrested and charged with bank robbery. *Id.* at 1009-12. During their investigation police interviewed the wife, who falsely confessed to assisting her husband with the robbery but subsequently claimed that this confession was the product of psychological coercion. *Id.* at 1011. Police used this confession to support charges filed against the couple, and the trial court denied a motion to suppress after a preliminary hearing. *Id.* at 1012. Charges were subsequently dropped, and the Sornbergers then brought suit under § 1983.

Evaluating the wife's Fifth Amendment claim, the Seventh Circuit began by noting that "her 'criminal case' advanced significantly farther than did that of the *Chavez* plaintiff, who never had criminal charges filed against him at all. Teresa's statement, by contrast, allowed police to develop probable cause sufficient to charge her and initiate a criminal prosecution." *Id.* at 1025. Although the Seventh Circuit noted the Third and Fourth Circuit's decisions in *Renda* and *Burrell*, *see id.* at 1025-26, it reached the opposite conclusion:

> [W]e are satisfied that her unwarned statements were used against her in a 'criminal case' and in a manner that implicates the Self-Incrimination Clause. Before charges against Teresa and her husband eventually were dropped, a preliminary hearing was held to determine whether probable cause existed to allow the case against her to go to trial. Teresa's confes-

sion was offered by the prosecution to support a determination of probable cause. Her confession was then used to set the amount of bail . . . . At a subsequent arraignment on charges stemming from the . . . robbery, Teresa's confession was once again admitted before she was called upon to plead guilty or not guilty.

*Id.* at 1026 (footnote omitted). *Sornberger* concluded that "where, as here, a suspect's criminal prosecution was not only initiated, but was commenced *because* of her allegedly unwarned confession, the 'criminal case' contemplated by the Self-Incrimination Clause has begun. . . . This use of Teresa's confession, if the confession is indeed found to have been elicited without *Miranda* warnings, allows a suit for damages under § 1983." *Id.* at 1026-27 (emphasis in original). The court specifically "refuse[d] to hold that the right against self-incrimination cannot be violated unless a confession is introduced in the prosecution's case-in-chief at trial before the ultimate finder of fact." *Id.* at 1027 n.15.

More recently, the Second Circuit joined the Seventh Circuit in rejecting the view that police coercion violates the Fifth Amendment only if the confession is used at trial. In *Higazy v. Templeton*, 505 F.3d 161 (2d Cir. 2007), government officials used allegedly coerced statements by Higazy as the basis for filing a criminal complaint and opposing bail. *Id.* at 167. The government later withdrew its complaint, and Higazy was released. *Id.* He then filed a *Bivens* action against federal officials. *Id.* at 168.

Although Higazy's statements were never used against him at a criminal trial, the Second Circuit held that the government's use of his statements against him at the preliminary bail hearing was a sufficient basis for alleging a violation of his Fifth Amendment rights. *Id.* at 170. "Higazy's initial appearance . . ., which included the determination of whether he would be detained or released on bail, was part of the crim-

inal case against Higazy," held the Second Circuit, so the government's use of coerced statements at that hearing violated his Fifth Amendment rights.[13] *Id.* at 173.

**[13]** We adopt the general approach of *Sornberger* and *Higazy*: A coerced statement has been "used" in a criminal case when it has been relied upon to file formal charges against the declarant, to determine judicially that the prosecution may proceed, and to determine pretrial custody status. Such uses impose precisely the burden precluded by the Fifth Amendment: namely, they make the declarant a witness against himself in a criminal proceeding. Here, for example, in the Affidavit of Probable Cause supporting the Information and in the arraignment hearing, defendants essentially stated, "Paul said [insert coerced statement here]," rendering Paul a witness against himself.[14] We therefore join the Second and Seventh Circuits in holding that use of the coerced statements *at trial* is not necessary for Paul to assert a claim for violation of his rights under the Fifth Amendment.[15]

---

[13]*Higazy* reaffirmed the Second Circuit's pre-*Chavez* ruling in *Weaver v. Brenner*, 40 F.3d 527 (2d Cir. 1994), which held that "use or derivative use of a compelled statement at any criminal proceeding," including grand jury proceedings, violates the declarant's rights under the Fifth Amendment. *Id.* at 535 (emphasis omitted). *Weaver* specifically held that "use of the statement at trial is not required." *Id.*

[14]We do not agree with the Stoots' circular argument that Paul's statements were "used" against him at the pretrial hearing to determine the admissibility of those same statements. Because we conclude that the statements were "used" against Paul in the relevant sense in both the Affidavit of Probable Cause supporting the Information and at his arraignment, however, the fact that the statements were not "used" at the admissibility hearing is of no moment.

[15]We note that our conclusion is responsive to the concerns expressed in Justice Souter's concurring opinion in *Chavez*. Justice Souter noted that his primary problem with plaintiff's argument in *Chavez* was that he "offers no limiting principle or reason to foresee a stopping place short of liability in all [cases involving coerced statements]." 538 U.S. at 778-79. The rule we adopt today, holding that the Fifth Amendment has been violated only when government officials use an incriminating statement to initiate

### B. CAUSATION

**[14]** Because Paul's rights under the Fifth Amendment were not violated until the allegedly coerced statements were used against him in an affidavit filed by the prosecutor and at arraignment, we must also decide whether the prosecutor's separate decision to rely on the statements in this manner served, as a matter of law, as a superseding cause that precludes Jensen's liability. *See Higazy*, 505 F.3d at 175; *Murray*, 405 F.3d at 289-93. Doing so, we conclude that on the present record, a jury could conclude that the use of the allegedly coerced statements against Paul was a reasonably foreseeable consequence of Jensen's decision to interrogate Paul and file a police report detailing his alleged confession, and that Jensen is therefore an appropriate defendant in this § 1983 suit.

Evaluating causation in this type of case requires us to consider two basic tort principles. *See Higazy*, 505 F.3d at 175; *Murray*, 405 F.3d at 292. On one hand, government officials, like other defendants, are generally responsible for the "natural" or "reasonably foreseeable" consequences of their actions. *Higazy*, 505 F.3d at 175 (citing *Monroe v. Pape*, 365 U.S. 167, 187 (1961)); *Murray*, 405 F.3d at 292. At the same time, however, liability may not attach if "an intervening decision of an informed, neutral decision-maker 'breaks' the chain of causation," meaning that the harm to the plaintiff can be traced more directly to an intervening actor. *Murray*, 405 F.3d at 292; *see also Higazy*, 505 F.3d at 175. The question is therefore whether use of the allegedly coerced statements was reasonably foreseeable to Jensen and, if so, whether some intervening decision broke this chain of causation.

---

or prove a criminal charge, provides a sensible "stopping place." In cases like *Chavez*, where the suspect was never charged, there would be no violation. Similarly, in cases where police coerce a statement but do not rely on that statement to file formal charges or oppose bail, the Fifth Amendment would not be implicated.

**[15]** Like the other circuits to address this question, we conclude that, absent unusual circumstances, a police officer eliciting incriminating statements from a criminal suspect "could reasonably have foreseen that a coerced confession would be used against [the suspect] and would lead to [the suspect's] detention." *Higazy*, 505 F.3d at 177; *see also McKinley v. City of Mansfield*, 404 F.3d 418, 436-39 (6th Cir. 2005). By the time he went to Paul's school to investigate A.B.'s allegations, Jensen viewed Paul as a suspect in a criminal case. At the interrogation, he employed the "Reid technique" to confirm his suspicion that Paul was guilty of molesting A.B. and then included several of Paul's incriminating statements in his official police report. Absent some evidence that Jensen later "attempted to prevent the use of the allegedly incriminating statements . . . or that he never turned the statements over to the prosecutor in the first place," *McKinley*, 404 F.3d at 439, a jury could infer that the subsequent uses of the statements to file criminal charges against Paul and to set conditions for his release at arraignment were reasonably foreseeable consequences of Jensen's conduct.

Given that reasonable inference, the prosecutor's decision to use the allegedly coerced statements in the affidavit and at arraignment did not serve, as a matter of law, as an intervening or superseding cause that cut off Jensen's liability. Just as a police officer may be held liable when a prosecutor files criminal charges against a defendant without probable cause, *see Hartman v. Moore*, 547 U.S. 250, 261-63 (2006), so too may an officer be held liable for wrongfully procuring statements then used by the prosecutor to initiate legal proceedings, *see McKinley*, 404 F.3d at 439. Here, there is no doubt that the prosecutor acted in reliance on the information Jensen provided rather than independently, as the Affidavit of Probable Cause specifically states that it is "based entirely" on "information . . . obtained through police reports and witness statements submitted by the [police department]," and "not on [the prosecutor's] personal knowledge."

**[16]** We therefore join the Sixth Circuit in concluding that ordinarily, "in actions brought under § 1983 for alleged violations of [the Fifth Amendment], it is the person who wrongfully coerces or otherwise induces the involuntary statement who causes the violation of the [Fifth Amendment] privilege." *McKinley*, 404 F.3d at 439 (internal quotation omitted).

## C. QUALIFIED IMMUNITY

Although we thus hold that the Stoots have alleged a violation by Jensen of Paul's rights under the Fifth Amendment, we also must decide whether Jensen is entitled to qualified immunity because his conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818 (internal quotation marks omitted). Defendants argue that Jensen is entitled to qualified immunity because, "[i]n light of the holding[ ] in *Chavez* . . ., a reasonable police officer would believe that a Fifth Amendment violation does not occur until the coerced statement is used against the person during the trial at which the suspect's guilt is determined." We disagree that the uncertainty resulting from *Chavez* is pertinent to the qualified immunity determination. Jensen's immunity cannot turn on whether, and in what way, a prosecutor ultimately "used" the statements allegedly coerced during Jensen's interrogation of Paul, as Jensen's role in the constitutional violation ended before that use.

At the time of the interrogation, Jensen was on notice under clearly established law that if he failed to provide Paul with appropriate *Miranda* warnings or physically or psychologically coerced a statement from Paul, the use of the confessions *could* ripen into a Fifth Amendment violation. That there was some uncertainty as to precisely what "use" in a criminal case would suffice does not matter. Qualified immunity is accorded so that reasonable officers are not deterred in carrying out their duties vigorously. *See Harlow*, 457 U.S. at 806-07. The qualified immunity evaluation must therefore

focus on an officer's duties, not on other aspects of the constitutional violation.

That the allegedly coerced confession did not "ripen" into a Fifth Amendment violation until it was "used" against Paul in a criminal case does not change this analysis, as Jensen had no reason to believe that the statements would not be used against Paul. *See Higazy*, 505 F.3d at 174. As the Second Circuit has explained, the reasonableness of a police officer's conduct in such a case depends on whether a reasonable officer in the defendant's position "would have understood that the confession allegedly coerced from [the suspect] would have been used in a criminal case against [the suspect]," in violation of his Fifth Amendment right to be free from compelled self-incrimination. *See id.* The question, in other words, is not whether a reasonable officer could have discerned the precise meaning of "use" in a criminal case under *Chavez*, but rather whether the officer obtained the allegedly coerced statements so that they could later be used against the suspect in a criminal case.

**[17]** As we have already explained in Part B above, a properly-instructed jury could find that some "use" of Paul's statements was reasonably foreseeable to Jensen at the time of the interrogation. We thus join the Second Circuit in holding that an officer is not entitled to qualified immunity where "[a] reasonable fact finder could conclude that it was not reasonable for an officer to believe that it was constitutional to coerce a confession and then to hand that information to a prosecutor — without divulging the means by which the confession was acquired — for use in a criminal case." *Id.* at 174-75.

**[18]** The district court did not separately analyze the merits of the Stoots' Fifth Amendment claim, focusing instead on the uncertainty in the lower courts regarding the meaning of "use" under *Chavez*.[16] As we explain above, the meaning of

---

[16]In a footnote, the district court did state that "[a] Fifth Amendment violation for a coercive interrogation was not clearly established where

"use" was irrelevant from Jensen's perspective, as his role in the potential violation of Paul's Fifth Amendment rights was complete the moment he turned over the allegedly coerced statements to prosecutors. We therefore reverse the district court's order granting summary judgment to defendants on this claim, and remand to the district court for further proceedings consistent with this opinion.

### III. Remaining Claims

The Stoots raised several additional claims in the district court, none of which have merit.

### A. Substantive Due Process

First, the Stoots argue that Jensen's coercive interrogation techniques violated Paul's right to substantive due process under the Fourteenth Amendment. As noted above, *Chavez* specifically held that claims for coercive interrogation can be brought under the Fourteenth Amendment. *See* 538 U.S. at 773 (plurality opinion of Thomas, J.); *id.* at 779 (Souter, J.); *id.* at 787 (Stevens, J.); *id.* at 799 (Kennedy, J.). The standard for showing a Fourteenth Amendment substantive due process violation, however, is quite demanding. *Chavez* refers to "police torture or other abuse" as actionable under the Fourteenth Amendment, 538 U.S. at 773, and Justice Kennedy's opinion

---

Detective Jensen provided Paul II with a Miranda warning, and could reasonably have believed that Paul II understood his rights." It is not clear whether the district court intended to pass on the merits of Paul's Fifth Amendment claim in this single sentence, as the district court did not provide any explanation for its conclusion that Jensen reasonably could have believed that he had complied with *Miranda* and did not specifically address the Stoots' allegations to the contrary in their complaint. Moreover, the district court did not address the totality of Stoots' Fifth Amendment claim, as, apart from their *Miranda* claim, the Stoots also allege that Jensen made improper promises to Paul and engaged in psychological coercion.

states that "a constitutional right is traduced the moment torture or its close equivalents are brought to bear." *Id.* at 789. Such language is consistent with the general rule that "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense' " and therefore a violation of substantive due process. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)). More specifically, a Fourteenth Amendment claim of this type is cognizable only if the alleged abuse of power "shocks the conscience" and "violates the decencies of civilized conduct." *Id.* at 846 (internal quotations omitted).

**[19]** Jensen's interrogation techniques, even when construed in the light most favorable to the Stoots, did not rise to the level of a Fourteenth Amendment violation. The Stoots allege that Jensen used "improper promises and threats . . . . [that] clearly overcame whatever will this child could have in denying these allegations." They claim that because Paul was "a developmentally delayed young boy, he could not fully and accurately comprehend if these promises were reasonable, or make an accurate assessment of the potential outcomes in the same manner as an adult." And they correctly note that under this court's precedent, *psychological* coercion is sufficient to state a claim under the Fourteenth Amendment. *See Cooper v. Dupnik*, 963 F.2d 1220, 1245 (9th Cir. 1992) (en banc).

While these allegations might be relevant to the question of whether Paul's confession was in fact voluntary and therefore admissible, an issue the juvenile court resolved in Paul's favor, they fall below what is required to state a claim under the Fourteenth Amendment. Noticeably lacking, for example, is any allegation that Jensen "intended to injure [Paul] in some way unjustifiable by any government interest," as required by precedent. *Lewis*, 523 U.S. at 849. Nor do the cases cited by the Stoots support their position. *Cooper*, for example, involved a calculated plan "to ignore the suspect's Constitutional right to remain silent as well as any request he

might make to speak with an attorney . . ., to hold the suspect incommunicado, and to pressure and interrogate him until he confessed," in full recognition that such actions were unlawful under *Miranda* and would render any confession inadmissible at trial. 963 F.2d at 1224. This court described the officers' techniques as "sophisticated psychological torture" designed to "extract a confession" after "hours of mistreatment," the "twentieth-century inquisitorial version of the Star Chamber." 963 F.2d at 1248.

As nothing in the Stoots' complaint alleges conduct of a similar nature, we affirm the district court's grant of summary judgment to defendants on the Stoots' Fourteenth Amendment claim.

## B. MUNICIPAL LIABILITY

[20] The Stoots also assert a claim for municipal liability, arguing that the City's policies led to the violation of Paul's rights. But the Stoots have not shown that any constitutional violation was caused by a policy or custom of the City of Everett, as required to impose municipal liability. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978).

With regard to the Fourth Amendment claim, the Stoots allege that the City routinely violated its own policy of requiring all child victims under the age of ten to be interviewed by a child victim specialist. The Stoots maintain that the official policy demonstrates the City's awareness of "the problem of child suggestibility" in forensic interviews, and that its *de facto* policy of ignoring these guidelines shows that the City was deliberately indifferent to the risk of false allegations. This argument is unpersuasive, for two reasons.

First, as discussed above, *see supra* note 9, we have previously held that a person suspected of child abuse does not enjoy any constitutional right "to have child witnesses . . . interviewed in a particular manner or pursuant to a certain

protocol," even when allegedly improper techniques lead to false accusations. *See Devereaux*, 218 F.3d at 1053. The fact that the city violated its own written policy in this regard is thus irrelevant, as that policy did not create any rights remediable under § 1983.

Second, as the district court noted, "there is no evidence that Detective Jensen was unqualified to interview A.B." Rather, the record reflects that Jensen had 280 hours of training focused on child physical and sexual abuse, and 32 hours on forensic child interviewing techniques. We therefore cannot fault any city policy or practice that permitted Jensen to interview A.B., as he appears well-qualified to have done so.

With regard to the Fifth Amendment claim, the Stoots allege that the City failed to properly train or supervise Jensen in conducting juvenile interrogations, and that the continued use of the so-called "Reid technique" of blaming the victim "amount[s] to a deliberate indifference to the need to protect the most vulnerable members of society." Again, however, the Stoots have failed to identify any case law establishing that a particular interview technique, applied to juveniles, violates their constitutional or statutory rights, nor have they identified any incident other than Paul's to corroborate their claims of deliberate indifference.

In short, the Stoots have failed to provide any evidence that the violation of Paul's rights resulted from a policy or practice of the City of Everett that repeatedly caused such violations. We therefore affirm the district court's grant of summary judgment to defendants on this claim.

## C. STATE LAW CLAIM FOR OUTRAGE

[21] Finally, the Stoots allege a state law claim for intentional infliction of emotional distress or "outrage." This state law cause of action requires showing, *inter alia*, "extreme and outrageous conduct" and "intentional or reckless infliction of

emotional distress," *see Grimsby v. Samson*, 530 P.2d 291, 295 (Wash. 1975), an exacting standard. "Liability exists only where the conduct has been [s]o outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (internal quotation omitted). Applying this standard, the Stoots' state law claim fails for the same reasons outlined above with respect to substantive due process. We therefore affirm the district court's grant of summary judgment to defendants on this claim as well.

## CONCLUSION

We AFFIRM the district court's grant of summary judgment to defendants on all claims, except the Fifth Amendment coerced confession claim. With regard to that claim, we REVERSE the district court's order granting summary judgment to Jensen and remand for further proceedings. The parties shall bear their own costs on appeal.